

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 MAR 17  AM 9: 58

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **GEORGE CRAWFORD** | **CIVIL ACTION** |
| **VERSUS** | **NO. 04-0748** |
| **BURL CAIN,**<br>**Warden, Louisiana State Penitentiary** | **SECTION "R"(6)** |

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing. For the reasons set forth below, it is recommended that the instant petition be **DENIED**.

## I. PROCEDURAL HISTORY

Petitioner, George Crawford, is a prisoner presently incarcerated in the Louisiana State Penitentiary, located in Angola, Louisiana. On January 7, 1997, Crawford, along with co-defendant, Larry Lindsey, was convicted, following trial by jury, of the first degree murder of Sherri Bailes. The following day, the jury deadlocked with respect to the penalty to be imposed and the trial court sentenced both defendants to life imprisonment without benefit of parole,

___ Fee_____
___ /Process_____
**X** / Dktd_____
**V** CtRmDep_____
___ Doc. No _____

probation or suspension of sentence.  On March 10, 1999, the Louisiana Fourth Circuit Court of Appeal denied petitioner's direct appeal, affirming his conviction and life sentence.  *State v. Lindsey*, 737 So.2d 978 (La. App. 4 Cir. 1999) (unpublished opinion).  On October 15, 1999, the Louisiana Supreme Court denied petitioner's writ application, thereby rendering his conviction and sentence final.  *State v. Lindsey*, 748 So.2d 463 (La. 1999).

On October 12, 2000, petitioner filed with the state trial court an application for post-conviction relief.  Petitioner's efforts in this regard culminated on March 12, 2004, when the Louisiana Supreme Court denied his writ application.  *State v. Crawford*, 869 So.2d 815 (La. 2004).

In the instant petition for federal habeas corpus relief, petitioner claims: 1) That insufficient evidence was submitted to support his conviction; 2) that the State failed to disclose exculpatory material and impeachment evidence; and, 3) that he was denied his right to effective assistance of counsel.  In its response, the State concedes that petitioner has exhausted his state court remedies as required under *Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982),[1] but claims that the instant matter was not timely filed within the one-year statute of limitations imposed under 28 U.S.C. § 2244(d)(1).[2]

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a petitioner has one year within which to bring his habeas corpus claims pursuant to 28 U.S.C. §

---

[1]*See* State's response (doc. # 9) at p. 4.

[2]*See* State's response (doc. # 9) at p. 13.

2254, with this one year period commencing to run from "the latest of" either the date the petitioner's state judgment became final or the expiration of his time for seeking review.[3]   *See* 28 U.S.C. § 2244(d)(1) (West 2005), as amended by the AEDPA, P.L. 104-132, 110 Stat. 1220. In this case, the parties agree that petitioner's conviction became final on October 15, 1999.[4] However, petitioner's time for seeking review did not expire until 90 days later, on January 13, 2000, when his time for filing a petition for a writ of certiorari with the United States Supreme Court ended.  *See* Sup.Ct.R. 13(1); *see also Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999), *cert. denied*, 529 U.S. 1099, 120 S.Ct. 1834, 146 L.Ed.2d 777 (2000); *Habteselassie v. Novak*, 209 F.3d 1208, 1209 (10th Cir. 2000); *Harris v. Hutchinson*, 209 F.3d 325, 328 n.1 (4th Cir. 2000).[5]  Thus, petitioner had a year from January 13, 2000, until January 13, 2001, to timely seek habeas corpus relief.

Petitioner did not file the instant action until over three years later, on March 15, 2004.  Thus, petitioner's federal habeas corpus application must be dismissed as untimely, unless the one-year statute of limitations period was interrupted as set forth in 28 U.S.C. § 2244(d)(2). Under that statutory provision, "[t]he time during which a properly filed application for State

---

[3] The AEDPA applies to this case as it was filed after the enactment of the AEDPA, or after April 24, 1996.  *Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 2060, 138 L.Ed.2d 481 (1997).

[4]*See* State's response (doc. # 9) at p. 15; *see* petitioner's reply to response (doc. # 12) at p. 2.

[5]In neither the State's response nor petitioner 's reply is the 90 days petitioner had to seek relief from the United States Supreme Court considered in calculating the expiration of petitioner's one-year statute of limitations.

post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."

The parties agree that petitioner filed an application for post-conviction relief with the state trial court on October 12, 2000,[6] thereby allowing 272 days of his 365-day limitation period to expire.  The parties further agree that no additional prescription days expired during the period when petitioner's post-conviction application was pending before the state trial court and later before the state appellate court.[7]  However, a disagreement arises with respect to whether any prescription days expired between the time the state appellate court denied petitioner's post-conviction application and the time petitioner sought relief from the Louisiana Supreme Court.

Following the Louisiana Fourth Circuit's March 14, 2003 denial of petitioner's application for rehearing, the parties agree that petitioner had 30 days within which to timely seek relief from the Louisiana Supreme Court.  The State asserts that because that 30-day time limit ended on April 13, 2003, and petitioner did not file his writ application until April 14, 2003, two additional prescription days expired.[8]  Petitioner, however, in response, properly points out that his April 13, 2003 deadline fell on a Sunday and, under applicable state law, filing deadlines which fall on weekends are extended to the next business day which, in this case, was Monday,

---

[6]*See* the State's response (doc. # 9) at p. 14; *see* petitioner's reply (doc. # 12) at p. 2.

[7]*See* the State's response (doc. # 9) at p. 14; *see* petitioner's reply (doc. # 12) at pp. 2-3.

[8]*See* the State's response (doc. # 9) at p. 14.  Under *Melancon v. Kaylo*, 259 F.3d 401, 407 (5th Cir. 2001), once the allotted time for seeking review has lapsed, a state post-conviction proceeding "ceases to be pending," and therefore, ceases to interrupt prescription.

4

April 14, 2003, the date petitioner filed his writ application with the Louisiana Supreme Court.[9]

Accordingly, petitioner's writ application was not untimely and no additional prescription days

expired.

Following the Louisiana Supreme Court's March 12, 2004 denial of petitioner's

writ application, the parties agree that prescription, once again, commenced to run.[10]  After three

more prescription days expired, petitioner, on March 15, 2004, filed the above-captioned habeas

petition.  Because, at that point, 90 days of petitioner's 365-day prescriptive period remained, the

instant action is clearly not time barred.

## II. FACTS[11]

Anthony Graffeo testified that on September 22, 1994, while employed as a New

Orleans Police Department Homicide Detective, he was dispatched to the Fischer Housing

Project to investigate a shooting.[12]  Upon his arrival on the scene, Graffeo was informed that two

people, later identified as Sherri Bailes and Elijah Mitchell, had been shot and had been taken to

Charity Hospital.[13]  Thereafter, Graffeo observed two vehicles in the area, one of which was a

---

[9]*See* petitioner's reply (doc. # 12) at p. 3.

[10]*See* the State's response (doc. # 9) at p. 14; *see* petitioner's reply (doc. # 12) at p. 3.

[11]The facts set forth herein are based upon this court's review of the trial testimony and the
Louisiana Fourth Circuit Court of Appeal's opinion, *State v. Crawford*, 848 So.2d 615 (La. App.
4 Cir. 2003), denying petitioner relief in connection with his application for post-conviction
relief.

[12]Approximately a year and a half prior to petitioner's trial, Graffeo left the New Orleans
Police Department to become a Louisiana State Trooper.

[13]Bailes later died from her gunshot wounds, but Mitchell survived.

black corvette in which the two victims had been sitting at the time they were shot.  Graffeo

stated that the back window of the corvette had been "blown out", that there were "pool[s] of

blood" on both the front seats, and that "a piece of cocaine" wrapped in cellophane was found on

one of the seats.[14]  Graffeo also observed, in the area around the black corvette, several "spent"

nine millimeter casings.[15]  The fact that several shots were fired was confirmed by New Orleans

Police Officer Byron Winbush, a firearms expert.  Winbush testified that two nine millimeter

bullets were recovered from Bailes' body during the autopsy and 12 nine millimeter cartridge

casings were found on the scene.[16]  Based upon his testing of the casings, which reflected that

they did not all come from the same gun, Winbush concluded that two guns were involved in the

pertinent shooting.

Graffeo testified that shortly after the shooting, it was unknown whether or not

anyone had seen what happened.  However, on the second day of his investigation, Shirley Davis

stepped forward, advising that she had witnessed the shooting.  Davis informed that there were

two shooters, one of whom she identified as Larry Lindsey, a person she knew.  However, Davis

knew the second shooter only by his first name, "George".[17]

---

[14]*See* State rec., vol. 3 of 5, trial transcript at pp. 43-44 and p. 59.

[15]*See* State rec., vol. 3 of 5, trial transcript at p. 44.

[16]*See* State rec., vol. 3 of 5, trial transcript at p. 66.

[17]*See* State rec., vol. 3 of 5, trial transcript at p. 47.

Following Davis' identification, Graffeo put together a photographic lineup which contained a photograph of Larry Lindsey, along with five other potential suspects.[18] From this lineup, Davis picked out Lindsey's photograph, identifying him as one of the shooters.[19]

Following Davis' photographic identification, a warrant was issued for Lindsey's arrest. It was following Lindsey's arrest that Graffeo learned that the second shooter's last name was "Crawford".[20] Upon learning the second shooter's first and last names, a second photographic lineup was created. Upon seeing this second photographic lineup, Davis identified Crawford as the second shooter.[21]

The eyewitness, Shirley Davis, a resident in the Fischer Housing Project, testified that on the date at issue, she observed two men, wearing bandanas, get out of a car, each with a gun in his possession.[22] She continued to observe the two men, watching them walk through a nearby breezeway, then commence shooting at two persons sitting in a black corvette.[23] After shooting several shots, the two men walked back to their car and drove away.[24]

---

[18]Graffeo informed that initially, having only the first name of the second shooter, he was not able to put together a second photographic lineup for purposes of identifying the second shooter. *See* State rec., vol. 3 of 5, trial transcript at p. 48.

[19]*See* State rec., vol. 3 of 5, trial transcript at p. 48.

[20]*See* State rec., vol. 3 of 5, trial transcript at p. 50.

[21]*See* State rec., vol. 3 of 5, trial transcript at pp. 103-104.

[22]*See* State rec., vol. 3 of 5, trial transcript at pp. 110, 113 and 114.

[23]*See* State rec., vol. 3 of 5, trial transcript at pp. 112-113.

[24]*See* State rec., vol. 3 of 5, trial transcript at pp. 113-114.

Following the shooting, Davis went inside, where she stayed when police arrived on the scene. It was not until the following day that she approached the investigating police officers, informing that she had witnessed the shooting.[25]

Upon informing police that she had seen what happened, Davis was taken to the homicide division where she gave officials a statement. It was at that time that she provided police with the full name, "Larry Lindsey", of one of the shooters, and the first name, "George", of the other shooter.[26] Shortly thereafter, a photographic lineup was presented to her and she picked out the photograph of Larry Lindsey, identifying him as one of the shooters.[27] A couple of months later, she returned to the homicide division where she was presented another photographic lineup. It was during this lineup that she picked out the photograph of petitioner, George Crawford, identifying him as the second shooter.[28]

Elijah Mitchell, who admitted to being a convicted felon and, at the time of trial, was incarcerated in Texas in connection with a probation violation, testified that on the date at issue, he and Bailes were sitting in her black corvette arguing with one another. During the argument, Mitchell noticed someone walking toward the car and turned to see who it was. At that point, before he really saw who was approaching the car, Mitchell was shot in the head.[29]

---

[25]See State rec., vol. 3 of 5, trial transcript at pp. 114-115.

[26]See State rec., vol. 3 of 5, trial transcript at p. 115.

[27]See State rec., vol. 3 of 5, trial transcript at pp. 115-116.

[28]See State rec., vol. 3 of 5, trial transcript at p. 117.

[29]See State rec., vol. 3 of 5, trial transcript at pp. 77-78.

Following this first shot, Mitchell stated that he "turned completely around" and recognized the two shooters, knowing both their first and last names.[30]  Mitchell stated that he had met the two shooters,  Larry Lindsey and George Crawford, approximately a month before the shooting and admitted to having had arguments with both men, the last argument taking place only two days before the shooting.[31]  Mitchell estimated that he was shot a total of ten times.[32]

As a result of his gunshot wounds, Mitchell remained in the hospital approximately two weeks.  Following his release, a police detective came to his home and showed him two sets of photographs.  From the first set, he picked out a photograph of Larry Lindsey, identifying him as one of the shooters.  From the second set, he picked out petitioner's photograph, identifying him as the second shooter.[33]

## III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") includes a comprehensive overhaul of federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law where there has been an adjudication on the merits in State court proceedings.

---

[30]*See* State rec., vol. 3 of 5, trial transcript at pp. 78, 79 and 81.

[31]*See* State rec., vol. 3 of 5, trial transcript at pp. 81 and 83.

[32]*See* State rec., vol. 3 of 5, trial transcript at p. 80.

[33]*See* State rec., vol. 3 of 5, trial transcript at pp. 81-83.

State court determinations of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference unless they were "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). The United States Supreme Court has advised that:

> Under the "contrary to" clause, a federal habeas corpus court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 1056, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); *Hill*, 210 F.3d at 485. Questions of fact found by the state court are "presumed to be correct ... and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hill*, 210 F.3d at 485, *quoting* 28 U.S.C.§ 2254(d)(2).

## IV. ANALYSIS

### A. INSUFFICIENCY OF EVIDENCE

When conducting a post-AEDPA sufficiency of the evidence review, a federal court may grant relief only if it determines that the state court decision rested on an "unreasonable application" of clearly established Federal law, as determined by the Supreme Court, to the facts of the case. *See* 28 U.S.C. § 2254 (d)(1).

In its analysis of petitioner's insufficiency of evidence claim, the Louisiana Fourth

Circuit Court of Appeal first set forth the applicable law, stating:

> In *State v. Sellers,* 2001-1903, p. 4 (La.App. 4 Cir. 4/10/02), 818 So.2d
> 231, 234, this court provided the general test for determining the sufficiency of
> evidence:
>
> > When assessing the sufficiency of evidence to support a
> > conviction, the appellate court must determine whether, viewing
> > the evidence in the light most favorable to the prosecution, any
> > rational trier of fact could have found proof beyond a reasonable
> > doubt of each of the essential elements of the crime charged.
> > *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560
> > (1979); *State v. Cummings,* 95-1377 (La.2/28/96), 668 So.2d 1132,
> > 1134. If rational triers of fact could disagree as to the
> > interpretation of the evidence, the rational trier's view of all the
> > evidence most favorable to the prosecution must be adopted. A
> > reviewing court is not called upon to decide whether it believes the
> > witnesses or whether the conviction is contrary to the weight of the
> > evidence. *State v. Smith,* 600 So.2d 1319, 1324 (La.1992).

*Crawford*, 848 So.2d at 621.

The state appellate court then examined the State's burden of proof, i.e., the

essential elements of the applicable crime, along with the basis of Crawford's claim that the State

failed to satisfy its burden of proof.

> Crawford was convicted of first-degree murder, which is defined in
> pertinent part by La. R.S. 14:30 as the killing of a human being "[w]hen the
> offender has the specific intent to kill or to inflict great bodily harm upon more
> than one person." La. R.S. 14:30A(3). In the present case, the physical evidence
> proved that the perpetrators killed Ms. Bailes while trying to kill or inflict great
> bodily harm on Mr. Mitchell. Crawford does not argue that the State failed to
> prove that a first-degree murder occurred. Instead, Crawford argues the State
> failed to prove he was one of the men who committed the first-degree murder.

*Crawford*, 848 So.2d at 621-622.

In support of his claim that the State failed to prove that he was one of the men who murdered Sherri Bailes, petitioner attacks the credibility of the two eyewitnesses, Shirley Davis and Elijah Mitchell.  Petitioner claims that their divergent stories with regard to the murder of Sherri Bailes render their testimony "mutually exclusive".  As such, the jury "had no choice except to believe one version of the shooting or the other" and, based upon their lack of credibility, neither of their versions of events were sufficient to support his first-degree murder conviction.  *See Crawford*, 848 So.2d at 622; *see also* Federal rec., doc. # 1, petitioner's supporting memorandum at p. 11.

In support of the above argument, petitioner asserts that while Mitchell testified that "the accomplice [i.e., petitioner] did not begin shooting until he was immediately alongside Bailes' car", Davis testified that "Lindsey's accomplice shot from a porch more than 50 feet away from Bailes' car".[34]  However, as shown below, petitioner has exaggerated the inconsistency between the two witnesses's accounts.

A close review of the trial transcript reflects testimony from Mitchell to the effect that following the first shot, which hit him in the head, he "turned **completely** around", saw the two shooters, then was hit with two shots to his face and one in his shoulder.[35]  The fact that Mitchell had to turn "completely around" to see the shooters, rather than turning slightly to his right to look out the passenger side window, reflects that the shooters were behind the car, rather

---

[34]*See* Federal rec., doc. # 1, petitioner's supporting memorandum at p. 11.

[35]*See* State rec., vol. 3 of 5, trial transcript at p. 78 (emphasis added).

than alongside it, when they commenced firing.  With respect to Davis, she testified, in pertinent

part, as follows:

> Q.  What did they [i.e., the perpetrators] do when they got to the breezeway, did you see?
>
> A.  Went on through the breezeway.
>
> Q.  What happened after **they got all the way through the breezeway**?
>
> A.  When they **got to the front [of the breezeway] that's when they had started shooting**.[36]

Thus, while the shooters, according to Davis, may have been on the porch or the breezeway

leading to the street when they started shooting, they were at the end of the breezeway, about to

step onto the street where the black corvette was located.

The Louisiana Fourth Circuit Court of Appeal, in rejecting the above claim,

likewise recognized petitioner's exaggeration with respect to the alleged inconsistency,

reasoning:

> Crawford initially points to the testimony of Ms. Davis that the perpetrators only shot from the porch area of the courtyard, in contrast to Mr. Mitchell's testimony that the men were walking up to him when they began shooting at the car.  However, Ms. Davis testified that she saw the perpetrators **begin** shooting when they were walking through the breezeway.  In addition, when later asked if all shots were fired from the porch, she replied that the perpetrators "came up off the porch" when they were shooting.

*Crawford*, 848 So.2d at 622 (emphasis original).

---

[36]*See* State rec., vol. 3 of 5, trial transcript at p. 112 (emphasis added).

Petitioner attacks Davis' credibility based upon her allegedly contradictory testimony as to whether she actually witnessed the shooting at issue.[37] However, as the Louisiana Fourth Circuit explained, when Davis' seemingly contradictory responses are read in context, i.e., are read in connection with the question prompting her response, there is, in fact, no contradiction in her testimony.

> Ms. Davis first testified that she saw the perpetrators shooting when they got to the front of the breezeway and that the perpetrators were still walking through the breezeway when they began shooting. She also testified that she saw both perpetrators firing. Crawford claims that Ms. Davis' testimony is inconsistent as to whether she saw the shooting at the front of the building. The prosecutor asked Ms. Davis: "[Y]ou didn't see who did the shooting outside in front of the building on Thayer? Is that correct?" Ms. Davis replied, "Yes." Although Crawford describes this testimony as Ms. Davis admitting she did not see any of the shooting, the question presented [to] her was whether she saw the shooting after the perpetrators exited the breezeway and walked to the front of the building, where Ms. Davis insisted at trial she did not go. Her answer that she did not see the shooting after the perpetrators got to the front of the building does not contradict her testimony that she saw the perpetrators shooting in the breezeway.

*Crawford*, 848 So.2d at 622.

Petitioner further complains that Davis lacked credibility due to her allegedly inconsistent testimony regarding whether the perpetrators had their faces covered when they got out of their car. A review of the pertinent testimony reflects that when Davis was asked, "...when they first got out of the car, did they already have the bandannas on?" Davis replied, "Yes, they did."[38] Later, Davis stated that the perpetrators put bandannas over their mouths "as soon as they

---

[37] *See* Federal rec., doc. # 1, petitioner's supporting memorandum at p.11.

[38] *See* petitioner's Exhibit A at Bates-stamped p. 241.

14

got out of the car."[39]  However, such an inconsistency, if it can even be considered an inconsistency, did not, as the Louisiana Fourth Circuit concluded, "render [Davis's] testimony unbelieveable."  *Crawford*, 848 So.2d at 622.

Next, petitioner challenges Davis' credibility based upon his claim that her testimony was in conflict with the physical evidence uncovered at the crime scene.  Specifically, Davis' "testimony that the shooters fired from the porch more than 50 feet away from Bailes' car cannot be reconciled with the fact that spent shell casings were found only in the street and in Bailes' car, not near the porch.  Her testimony in this regard is also in direct conflict with the forensic evidence presented by the coroner, which showed steep downward-angled bullet wounds that could not have been inflicted by shooters firing from the porch."[40]  However, as the Fourth Circuit explained, the above-described physical evidence is not in conflict with Davis' testimony in that Davis never claimed to have followed the shooters to the front of the building and onto the street, witnessing all of the shots fired in connection with the murder of Sherri Bailes.  Instead, "her only viewpoint during the shooting was in the breezeway, where she testified that the shooting began."  *Crawford*, 848 So.2d at 622.  Once the shooters ascended from the breezeway onto the street, continuing to fire their guns, Davis ceased to be a witness.

Next, petitioner seeks to discredit Davis and Mitchell by virtue of testimony on their part which petitioner considers to be incredible such as:  1) Davis' testimony that she did

---

[39]*See* petitioner's Exhibit A at Bates-stamped p. 258.

[40]*See* Federal rec., doc. # 1, petitioner's supporting memorandum at pp. 11-12 (footnote omitted).

not discuss the shooting with anyone until she contacted Detective Graffeo the following day; 2)

Mitchell's testimony that after he was shot in the head, he was able to turn around in his seat and

see the two shooters "while being riddled with bullets"; 3) Mitchell's testimony that he saw

petitioner the day before the shooting wearing the same clothes he wore on the day of the

shooting; and, 4) Mitchell's testimony that despite the fact that he had been shot ten times, he

would have been able to discuss the matter with police at the crime scene shortly after the

shooting occurred if anyone had approached him for questioning.  Additionally, petitioner

contends that "Mitchell's extensive criminal record ... should have caused the jury to view his

testimony with additional skepticism."[41]

The fact that petitioner believes the above-described testimony was incredible and

that Mitchell's credibility was damaged by virtue of his criminal record, is, practically speaking,

irrelevant.  As the Fourth Circuit reasoned, in connection with petitioner's challenge to Davis'

testimony that she did not discuss the shooting with anyone prior to contacting police,

"[a]lthough Crawford finds this testimony suspect, there was no evidence presented at trial to

show that Ms. Davis discussed the shooting prior to that time."  *Crawford*, 848 So.2d at 622.  In

response to petitioner's charge that Mitchell's identification of the shooters after being shot in the

head was "'patently unbelievable'", the state appellate court reasoned:

> [T]he jury was aware of the fact that Mr. Mitchell was shot in the head, and it
> apparently chose to believe his testimony.  A fact finder's credibility decision
> should not be disturbed unless it is clearly contrary to the evidence.  In the present
> case, the jury was able to observe Mr. Mitchell's demeanor while testifying.  In

---

[41]*See* Federal rec., doc. # 1, petitioner's supporting memorandum at pp. 12-13.

addition, Mr. Mitchell knew both defendants, and he testified that he was shot as
he turned his head toward the men.

*Crawford*, 848 So.2d at 623.[42]  Mitchell's testimony that he was capable of speaking with police

at the crime scene was of little import in light of the stipulation entered into by the prosecution

and defendants that "the responding officers would testify that neither victim was able to give a

statement at the scene." *Id.*[43]  Finally, with respect to Mitchell's prior convictions, the Fourth

Circuit reasoned: "[T]he jury was aware of [his prior convictions] but chose to believe Mr.

Mitchell's testimony.  The jury as fact finder makes credibility calls, and the jury must have

concluded that Mr. Mitchell's prior convictions did not render his testimony unbelievable." *Id.*

Finally, in support of his claim that the testimony of Davis and Mitchell was

"mutually exclusive", petitioner points to discrepancies between their descriptions of the

weapons the shooters used and the clothes they were wearing.  Petitioner asserts that Davis

described the gun allegedly in his possession as "a long assault weapon" and said that he was

wearing "a dark colored long sleeve shirt, blue jeans, and a blue bandana."  In contrast, Mitchell

described the pertinent weapon as "a small handgun" and said the shooter wore "a light colored t-

shirt and tan pants, possibly shorts."[44]  However, as the court explained in *Gibbs v. Kemna*, 192

---

[42]Though not directly addressed by the state appellate court, the same reasoning is applicable
to petitioner's claim of incredibility with respect to Mitchell's testimony that he saw petitioner
the day before the shooting in the same clothes he was wearing on the day of the shooting.  There
was no evidence clearly contrary to Mitchell's testimony and therefore, a finding of credibility on
the part of the jury should not be disturbed.

[43]*See* State rec., vol. 3 of 5, trial transcript at pp. 160-161.

[44]*See* Federal rec., doc. # 1, petitioner's supporting memorandum at p. 11.

F.3d 1173, 1175-1176 (8th Cir. 1999), *cert. denied*, 531 U.S. 846, 121 S.Ct. 116, 148 L.Ed.2d 72

(2000), discrepancies in witnesses's descriptions of an assailant "relate to the reliability or

credibility of witnesses, not to the sufficiency of the evidence." In the instant action, the

prosecution presented two eyewitnesses who unequivocally testified that petitioner was one of

the shooters, both picking petitioner's photograph out of photographic lineups. The testimony of

either witness, if believed by the jury, would be sufficient evidence that petitioner was the

perpetrator of the crime at issue. As the *Gibbs* court reasoned:

> Although there was conflicting evidence presented to the jury concerning the
> witnesses's credibility, we must presume that the jury resolved any conflicting
> inferences in favor of the prosecution. [*Jackson*], 443 U.S. at 326....
> [Petitioner's] factual arguments that [the witnesses] could [not] be believed goes
> to their credibility, not to the substantiality of the evidence, and credibility is for
> the jury to decide. *Daniels v. Wood,* 819 F.2d 195, 198 (8th Cir.1987).

*Gibbs*, 192 F.3d at 1176.

Based upon the above, the court finds that the Louisiana Fourth Circuit Court of

Appeal's rejection of petitioner's insufficiency of evidence claim does not represent an

unreasonable application of Supreme Court law, specifically, *Jackson v. Virginia*, *supra*, to the

facts of this case. Accordingly, the court finds that the instant claim for federal habeas corpus

relief is without merit.

### B. FAILURE TO DISCLOSE IMPEACHMENT EVIDENCE

Petitioner contends that the State withheld evidence which, if known by defense

counsel, could have been used to impeach the credibility of eyewitnesses Shirley Davis and

18

Elijah Mitchell, along with investigating detective, Anthony Graffeo. According to petitioner,

the suppression of this impeachment evidence, viewed collectively, undermined confidence in

the jury's guilty verdict.

In addressing this issue, the Louisiana Fourth Circuit Court of Appeal first

examined the applicable law.

> To comport with the dictates of the due process clause of the Fourteenth
> Amendment, the State must disclose to the defense evidence that is favorable to
> the defense and is material to guilt or punishment. *Brady v. Maryland,* 373 U.S.
> 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *State v. Porter,* 98-0279 (La.App. 4
> Cir. 3/15/00), 756 So.2d 1156, *writ denied,* 2000- 1135 (La.1/10/02), 790 So.2d 3.
> Included in this rule is evidence that impeaches the testimony of a witness whose
> credibility or reliability may determine guilt or innocence. *Giglio v. U.S.,* 405
> U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). "[T]he prosecutor is not required
> to deliver his entire file to defense counsel, but only to disclose evidence
> favorable to the accused that, if suppressed, would deprive the defendant of a fair
> trial, that is, evidence favorable to the defendant which is material to guilt or
> punishment." *State v. Rosiere,* 488 So.2d 965, 970 (La.1986). *See also Porter,*
> *supra.*
> Materiality was defined in *U.S. v. Bagley,* 473 U.S. 667, 682, 105 S.Ct.
> 3375, 3383, 87 L.Ed.2d 481 (1985): "The evidence is material only if there is a
> reasonable probability that, had the evidence been disclosed to the defense, the
> result of the proceeding would have been different. A 'reasonable probability' is a
> probability sufficient to undermine confidence in the outcome." The same test is
> to be employed whether or not the defense makes a pretrial request for
> exculpatory evidence. *Bagley; State v. Phillips,* 92-1063 (La.App. 4 Cir. 2/29/96),
> 670 So.2d 588, *writ denied,* 96-2131 (La. 9/5/97), 699 So.2d 85.
> In *Kyles v. Whitley,* 514 U.S. 419, 434-435, 115 S.Ct. 1555, 1565-1566,
> 131 L.Ed.2d 490 (1995), the Court discussed "materiality":
>
>> Although the constitutional duty is triggered by the
>> potential impact of favorable but undisclosed evidence, a showing
>> of materiality does not require demonstration by a preponderance
>> that disclosure of the suppressed evidence would have resulted
>> ultimately in the defendant's acquittal (whether based on the
>> presence of reasonable doubt or acceptance of an explanation for

19

the crime that does not inculpate the defendant).... *Bagley's* touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the Government's evidentiary suppression "undermines confidence in the outcome of the trial." *Bagley,* 473 U.S., at 678, 105 S.Ct., at 3381.

The second aspect of *Bagley* materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Crawford*, 848 So.2d at 623-624.

### 1. Impeachment of Davis[45]

Petitioner claims that several of Davis' pre-trial representations constitute evidence which the State was required to reveal to the defense as a result of their impeachment value. Petitioner points to the supplemental police report prepared by Detective Graffeo[46] which

---

[45]In the ensuing discussion, the specific evidence allegedly suppressed by the State is discussed individually, on an item by item basis. However, the court is mindful of its obligation, as set forth in *Kyles*, 514 U.S. at 436, 115 S.Ct. at 1567, that said evidence must be considered collectively for purposes of determining the requisite materiality required under *Brady*.

[46]*See* petitioner's Exhibit A at Bates-stamped pp. 419-437.

reflects that Davis informed Graffeo that the second shooter's name was "George Ascort".

Compare this information with a transcription of an interview between Graffeo and Davis on

September 23, 1994,[47] the day after Bailes' murder, which reflects that Davis provided Graffeo

with the name of "George Caldwell".   At trial, Davis represented that she only knew the second

shooter as "George", she did not know his last name.[48]   Petitioner contends that a comparison of

the above evidence would have damaged Davis' credibility, in particular, her identification of

petitioner as one of the shooters "because it showed she had possibly identified two other men as

Lindsey's accomplice."   *Crawford*, 848 So.2d at 628.   For the following reasons, the court

disagrees.

First, when one reads Davis' pre-trial comments in context, it is clear that her

alleged "identification" of the second shooter as "George Ascort" or "George Caldwell" was far

from positive and was based not upon her personal knowledge, but rather, upon conjecture

swirling around shortly after the incident with respect to the identity of the second, unknown

shooter.   Graffeo's supplemental police report reflects that at 11:15 a.m., on the day following

the shooting, Graffeo received a telephone call from "a black female who refused to identify

herself", who informed that the first name of one of the gunman was "George", and his last name

was possibly "Jefferson".[49]   Less than an hour later, at 12:05 p.m., Graffeo was contacted via

telephone by Lester Mitchell, Elijah Mitchell's uncle, informing "that he had heard on the street

---

[47]*See* petitioner's Exhibit A at Bates-stamped pp. 470-478.

[48]*See* Federal rec., doc. # 1, petitioner's supporting memorandum at p. 14.

[49]*See* petitioner's Exhibit A at Bates-stamped p. 430.

from an unknown source that the perpetrators who shot his nephew were Larry Lindsey, black

male, approximately 21 years of age, 6'2" tall, thin build, dark skin, and has four gold teeth in his

mouth, and George, possible last name Ascort, black male, approximately 19 years of age, 6'4"

tall, heavy build, and also has four gold teeth in his mouth."[50]  Less than two hours later, at 1:50

p.m., Davis, apparently having heard the same information "on the street" that Lester Mitchell

heard, telephoned Graffeo and informed "that the perpetrators were Larry Lindsey, black male,

and George Ascort, black male."[51]  Despite her apparent certainty, less than three hours later,

when initially asked by Graffeo whether or not she knew the second perpetrator, Davis responded

in the negative.

> Q: Do you know the second perpetrator[]?
> A: No.[52]

Later, in the same interview, Davis identifies the second perpetrator as "George Caldwell".  This

alleged identification, however, is not based upon Davis' personal knowledge.

> Q.  Which one was that?
> A.  That's George.
> Q.  George.  Do you know him as George or that's just what you heard?
> A.  No, I got the whole name, George Caldwell.
> Q.  Okay, bu[t] you don't know that for a fact ... you just....

---

[50]*See* petitioner's Exhibit A at Bates-stamped p. 431.

[51]*See* petitioner's Exhibit A at Bates-stamped p. 431.

[52]*See* petitioner's Exhibit A at Bates-stamped p. 474.

A. I know that ... **people around there know that's his name**.[53]

As the Fourth Circuit pointed out, the above pre-trial evidence is not really in conflict with Davis' trial testimony in that, in both her trial testimony and her pre-trial representations, her identification of the second shooter was uncertain and the jury was well-aware of that uncertainty. *Crawford*, 848 So.2d at 628. Further, the materiality of the alleged conflict is significantly undermined by the consistency of Davis' pre-trial and trial identifications of petitioner as the second shooter. As the Fourth Circuit noted: "In a [pre-trial] photographic lineup and at trial, Ms. Davis positively identified Crawford as the George who committed the murder with Lindsey." *Id.* Based upon the above, the court does not find the above-described information was such that the State was required, under *Giglio*, *supra*, to turn it over as a result of its impeachment value.

Petitioner points to more differences between Davis' trial testimony and her September 23, 1994 interview in an effort to support his claim that the September 23, 1994 interview should have been turned over to the defense. Petitioner notes that Davis, at trial, testified that Larry Lindsey, at the time of the shooting, was wearing a purple hooded sweatshirt while petitioner was wearing a "dark colored" sweatshirt.[54] In contrast, Davis, during her interview, stated that Lindsey was wearing a "dark colored" shirt and petitioner was wearing a

---

[53]*See* petitioner's exhibit A at Bates-stamped p. 476 (emphasis added).

[54]*See* petitioner's Exhibit A at Bates-stamped pp. 257-258.

23

"purple and white shirt" with a hood on it.[55] Petitioner further notes that Davis testified at trial that when the perpetrators got out of their car, "they had guns in their hands."[56] However, during her interview, she stated that she "couldn't really tell" whether they had guns when they got out of their car.[57]

The Louisiana Fourth Circuit, in addressing petitioner's claim, placed the above-described differences in proper perspective, reasoning: "[D]iscrepancies concerning who wore which shirt and whether the guns were in the perpetrators' hands as they exited their car are distinctions that would not harm [Davis'] credibility. Both Ms. Davis and Mr. Mitchell testified that both men were armed and both shot at the car." *Crawford*, 848 So.2d at 629. Further, Davis' uncertainty as to what the shooters were wearing, like her uncertainty as to the second shooter's last name, is relatively insignificant when compared with her positive identification of both shooters at pre-trial photographic lineups as well as at trial. Accordingly, the State's failure to provide the defense with a transcript of Davis' September 23, 1994 interview did not constitute a violation of petitioner's constitutional rights.

Petitioner claims that Davis' pre-trial interview and trial testimony differed with respect to: 1) Who witnessed the shooting; 2) Davis' actions following the shooting; and, 3) the location of the shooters when they commenced firing at the victim's car. With respect to the

---

[55]*See* petitioner's Exhibit A at Bates-stamped pp. 475-476.

[56]*See* petitioner's Exhibit A at Bates-stamped p. 227.

[57]*See* petitioner's Exhibit A at Bates-stamped p. 472.

alleged witnesses, petitioner asserts that Davis, at trial, stated "that a number of her family

members witnessed the shooting ... while in the interview she said she did not know any of the

witnesses".[58]  However, this claim is not precisely correct.  At trial, Davis, on cross-examination,

responded in the affirmative when defense counsel queried:  "But you told [police] that your

auntie was in the car and she saw the same thing that you saw?"  However, she did not state at

trial that any other family member "saw the same thing that [she] saw."  The only other family

member who was mentioned in connection with this particular line of questioning was Davis'

mother who, according to Davis, was in the breezeway along with "[a] lot of people", and saw

the shooters walk through the breezeway.[59]  Similarly, petitioner, during her pre-trial interview,

stated:

> Q. Did you observe anyone else out there at the time of the shooting?
> A. Had a lot of people outside.
> Q. Any body in particular, or just a crowd from the area?
> A. A crowd of people from the area.[60]

Petitioner's claim that Davis offered different information at her pre-trial

interview and at trial with respect to her actions following the shooting is likewise misleading.  A

careful examination reflects that at trial, Davis was questioned with respect to her actions

immediately following the shooting, prior to the time the shooters drove away in their car.

---

[58]*See* Federal rec., doc. # 1, petitioner's supporting memorandum at p. 15.

[59]*See* petitioner's Exhibit A at Bates-stamped p. 251.

[60]*See* petitioner's Exhibit A at Bates-stamped p. 477.

Q. Now, what did you do immediately after the shooting?

A. Went inside.[61]


Q. Okay. So, did you ever walk outside through the breezeway where the **two cars** [i.e., the shooters' car and the victim's car] are parked? Did you ever come out to look?

A. What, where the shooting was?

Q. Yes.

A. No.[62]


In contrast, the pertinent questions posed to Davis during her interview seemingly concerned her actions after the shooters had left the area. Davis was questioned regarding the total number of shots the perpetrators had fired and whether she had heard the perpetrators say anything and, finally, whether she had observed the victim. To this last inquiry, Davis responded affirmatively, explaining: "[W]hen I went over there, she [i.e., Bailes] was just ... she ain't [sic] even move and when I looked at her, I saw she was gone, and when I see [sic] him [i.e., Mitchell], grasping [sic] for his breath, trying to say something out [of] his mouth".[63]

Finally, petitioner, once again, claims that at trial Davis testified that the shooters shot at the victim's car "from the porch" and that "she didn't see the shooting at all"; whereas, during her pre-trial interview she stated that the shooters "ran up on the car and started

---

[61]*See* petitioner's Exhibit A at Bates-stamped p. 231.

[62]*See* petitioner's Exhibit A at Bates-stamped p. 247.

[63]*See* petitioner's Exhibit A at Bates-stamped p. 473.

shooting".[64]  However, as explained earlier, petitioner's contention that Davis, at trial, stated that

she did not see the shooting and that the shots were fired from the porch or breezeway, is

inaccurate.[65]  Similarly, petitioner's contention as to what Davis stated in her pre-trial interview

is misleading because it is taken out of context.  Davis' response that they "ran up on the car and

started shooting" was provided in response to Detective Graffeo's leading question regarding

whether Davis could describe the perpetrators actions "[w]hen they ran to the car and started

shooting".[66]  When Graffeo, shortly thereafter, posed the following neutral question:  "[W]here

were they shooting from ...", Davis responded:  "They both was [sic] like, you know, where the

breeze-way [sic] [is] ..., they was [sic] like right there".[67]  Thus, once again, contrary to

petitioner's suggestion, Davis' trial testimony and pre-trial interview were essentially in sync.

　　　　　Petitioner next claims that information in Graffeo's supplemental report reflecting

that "Davis was unwilling to provide a recorded statement unless the N.O.P.D. arranged for a

new apartment for her outside the Fischer project" constituted material which could have been

used to impeach Davis since it contradicted her trial testimony to the effect that police made no

promises to her in exchange for which she picked petitioner's photograph from a photographic

lineup.[68]  According to petitioner, "[h]ad the jury known that Davis demanded a new apartment

---

[64]*See* Federal rec., doc. # 1, petitioner's supporting memorandum at p. 15.

[65]*See* discussion *supra* at pp. 13-14.

[66]*See*  petitioner's Exhibit A at Bates-stamped p. 472.

[67]*See* petitioner's Exhibit A at Bates-stamped p. 473.

[68]*See* petitioner's Exhibit A at Bates-stamped pp. 234-235.

for herself before she gave her statement, ... it could have reasonably inferred that Davis came

forward in order to secure new housing."[69]

In his supplemental report, Graffeo provided, in pertinent part: "Davis stated that

she witnessed the murder of Sherri Bailes and was scared for her life **because the perpetrators**

**were threatening her**.... Davis stated ... that she would come forward and give a statement only

if she could be relocated from the Fischer Housing Project."[70]  As the Fourth Circuit pointed out

in addressing petitioner's argument, had petitioner had access to the above information,

presenting it to the jury would have done him more harm than good in that it would have opened

the doors for the prosecution to question Davis regarding alleged threats made against her by the

murder suspects.

> The supplemental report indicates that the reason why Ms. Davis wanted
> the new apartment was because she had been threatened by the perpetrators, and
> the court had already ruled that no evidence of any threats could be presented
> unless the defense questioned Ms. Davis concerning why she waited until the next
> day to contact the police.  Asking her about this condition of giving the statement
> would fall within this exception to the prohibition on presenting evidence of the
> threats.

*Crawford*,  848 So.2d at 629.  Additionally, the Fourth Circuit noted that Davis' trial testimony

to the effect that "she received nothing from the police" was, in fact, accurate since Davis

"rejected the apartment offered to her".  *Id.*

---

[69]*See* Federal rec., doc. # 1, petitioner's supporting memorandum at p. 15.

[70]*See* petitioner's Exhibit A at Bates-stamped p. 431 (emphasis added).

Petitioner next argues that a 911 log reflecting a witness's statement to the effect that the perpetrators ran from the crime scene, in contrast to Davis' testimony that they walked from the scene, constitutes material which could have been used to impeach Davis.  However, as the Louisiana Fourth Circuit noted, the two witnesses's accounts are more similar than different in that they both relate "that the perpetrators left the scene."  Further, the state appellate court reflected that the 911 log would arguably "be inculpatory because flight is an indication of guilt." *Id.*

### 2. Impeachment of Mitchell

As with Davis, petitioner contends that Mitchell's pre-trial statements could have been used against him since, in these statements, Mitchell represented that he did not know "George's" last name,[71] but at trial, Mitchell stated that he knew both Crawford's first and last names.[72]  However, as was the case with respect to the alleged inconsistency between Davis' trial testimony and her pre-trial statements, the materiality of the above-described inconsistency is significantly undermined by virtue of Mitchell's consistent identification of petitioner as one of the shooters and consistent statements to the effect that he knew petitioner.  As the Fourth Circuit reasoned:

> [I]n both the statement and in his trial testimony Mr. Mitchell stated he knew
> George because George hung around his neighborhood with Lindsey, whom he
> identified by both first and last names.  In his statement, Mr. Mitchell described

---

[71]*See* petitioner's Exhibit A at Bates-stamped p. 488.

[72]*See* petitioner's Exhibit A at Bates-stamped p. 195.

> Lindsey and the defendant as the neighborhood "bullies" with whom he had
> argued several times, the last time being two days before the shooting.  Whether
> or not Mr. Mitchell knew Crawford's last name, in both his statement and in his
> testimony at trial he stated he knew both Lindsey and Crawford from the
> neighborhood.  He positively identified Crawford in the photographic lineup and
> in trial as one of the perpetrators.  Mr. Mitchell's statement as to whether he knew
> George's last name was inconsequential with respect to Mr. Mitchell's physical
> identification of Crawford as one of the perpetrators based on Crawford's physical
> appearance, regardless of his name.

*Crawford*, 848 So.2d at 626.

Petitioner next complains that there was a conflict between Mitchell's trial testimony and his pre-trial statement regarding where petitioner was located when Mitchell saw him shooting at Bailes' car.  According to petitioner, Mitchell, at trial, testified that petitioner "shot at him from directly outside the passenger side window", but prior to trial Mitchell stated that petitioner "shot at him from the rear of Bailes' car".[73]

As the court noted in connection with petitioner's insufficient evidence claim, a close review of the trial transcript reflects testimony from Mitchell to the effect that following the first shot, he "turned **completely** around" and saw the two shooters.[74]  The fact that Mitchell turned "completely" around to see the shooters reflects that the shooters were behind the car rather than on the side of it.  As such, the alleged inconsistency between Mitchell's pre-trial statement and trial testimony was negligible.  Further, to the extent Mitchell was inconsistent,

---

[73]*See* Federal rec., doc. # 1, petitioner's supporting memorandum at p. 16.

[74]*See* State rec., vol. 3 of 5, trial transcript at p. 78 (emphasis added).

said inconsistency was inconsequential in the face of his positive, consistent identification of

petitioner as one of the shooters.

Petitioner next complains that Mitchell's pre-trial statement should have been

produced because in it he stated that petitioner "used a 'small caliber' handgun - differentiating it

on the basis of caliber from Lindsey's nine-millimeter gun, which he recognized".[75]  This is

significant, according to petitioner, "because only nine-millimeter casings were recovered at the

scene.  Mitchell's credibility ... would have been severely undermined by such impeachment."[76]

However, even without Mitchell's pre-trial statement, petitioner received the benefit of any

damage to Mitchell's credibility arising from his observation with respect to the difference in

size between petitioner's gun and Lindsey's gun since Mitchell testified at trial that petitioner's

gun was smaller than Lindsey's.

> Q.  Okay.  Did they have anything in their hand when you saw them?
>
> A.  Yes.
>
> Q.  What did they have?
>
> A.  Each one had a gun.
>
> Q.  Did you get a look at what the gun looked like, what type of guns they were?
>
> A.  I seen [sic] the one Larry had.  It was a black gun.  I couldn't make it out at that time but I knew it was a gun but I had already been shot then.  I said I knew it was a gun.  I knew what type of gun it was at the time I seen [sic] it though.
>
> Q.  What type of gun was it?
>
> A.  It was a Tech 9.
>
> Q.  Did you see what kind of gun – first of all, did George have a gun?

---

[75]See Federal rec., doc. # 1, petitioner's supporting memorandum at p. 16.

[76]See Federal rec., doc. # 1, petitioner's supporting memorandum at pp. 16-17.

A.  Yes, **it was a smaller gun than [the one] Larry had**.[77]

Petitioner next contends that had the 911 log been produced, it could have been used to impeach Mitchell since the description of the perpetrator's clothing set forth in the log differed from Mitchell's description.  However, as the Fourth Circuit pointed out, in making the above argument, "Crawford ignores the fact that Ms. Davis' description of the perpetrators' clothing more closely matched that given in the 911 log, [thus, the 911 log supported Davis' credibility], and the jury heard her testimony on this point and was aware that it contradicted that of Mr. Mitchell.  [Thus,] [t]he jury was aware of these divergent descriptions...."  *Crawford*, 848 So.2d at 627.

Next, petitioner claims that Davis' pre-trial statement would have provided him with excellent impeachment material against Mitchell since Mitchell stated that shortly after the shooting, he was conscious and could have identified the perpetrators at that time if anyone had asked him to do so while Davis, in her pre-trial statement, represented that she observed Mitchell, following the shooting, "gasping for breath and fighting for life".[78]  However, even without Davis' pre-trial statement, the jury was already aware of "Mitchell's true condition" by virtue of "the stipulation given to the jury that if the officers who responded to the scene were to testify, they would state that neither victim was able to give a statement at the scene of the shooting."  *Crawford*, 848 So.2d at 627.

---

[77]*See* State rec., vol. 3 of 5, trial transcript at p. 79 (emphasis added).

[78]*See* Federal rec., doc. # 1, petitioner's supporting memorandum at p. 17.

Finally, with respect to Mitchell's credibility, or lack thereof, petitioner claims that Mitchell's medical records,[79] relating to the treatment he received following the shooting, should have been provided since they revealed that Mitchell had both marijuana and cocaine in his bloodstream. According to petitioner, even though Mitchell testified that he had used drugs and/or alcohol the night before the shooting, the medical records would have "provided objective proof that drugs were still in his system at the crucial, split-second moment he allegedly viewed the shooters. The jury could reasonably have inferred that he had used drugs more recently than the previous night, and/or that he was still under the influence of them at the time of the shooting."[80] This court, however, rejects petitioner's argument based upon the following reasoning set forth by the Fourth Circuit:

> The report indicates that Mr. Mitchell's system had cocaine and marijuana, but it is not clear from the report if the presence could only be attributed to use of these drugs on the day of the shooting, or if the results could also be indicative of use the night before, thus bolstering Mr. Mitchell's testimony. There is no indication that Crawford presented evidence at the post-conviction hearing, nor does he present any in his application, showing that the presence and levels of these drugs in Mr. Mitchell's system could only have occurred with use on the day of the shooting. Crawford did not meet his burden of showing that this evidence proved Mr. Mitchell was so impaired at the time of the shooting that he could not identify his assailants.

*Crawford*, 848 So.2d at 627-628.

---

[79]A copy of said records are located at petitioner's Exhibit A, Bates-stamped pp. 494-499.

[80]*See* Federal rec., doc. # 1, petitioner's supporting memorandum at p. 18.

### 3. Impeachment of Detective Graffeo

Petitioner claims that if the State had produced the supplemental police report and the pre-trial statements of Davis and Mitchell, he could have used the information contained therein to impeach the trial testimony of Detective Graffeo. According to petitioner, Graffeo made two statements at trial that were "patently false". First, he testified that Davis could not provide him with a last name for "George", Lindsey's accomplice. However, Graffeo's supplemental report reflects that Davis identified Lindsey's accomplice as "George Ascort" and in her pre-trial statement, she identified the second shooter as "George Caldwell". However, as the Fourth Circuit noted in rejecting the instant claim, the "jury was aware that the police had the names of other Georges." *Crawford* 848 So.2d at 630. Specifically, Graffeo informed:

> Q. Did Ms. Davis also indicate to you whether she knew these individuals?
> A. She said that she knew Mr. Lindsay because he had dated her sister previously.
> Q. Was she familiar with George as well?
> A. She knew him from the area but she didn't have a last name on him. **I received numerous last names, Jefferson, Ashcott [sic], and different names but no one was positively sure what it was.**[81]

Thus, given the fact that the jury was aware of the different last names initially assigned to the second shooter, the significance of the fact that Davis supplied two of the last names is relatively insignificant.

Petitioner next complains that Detective Graffeo testified that the persons providing him with various last names for "George", the second shooter, "knew that he hung

---

[81]*See* State rec., vol. 3 of 5, trial transcript at p. 48 (emphasis added).

around the area", i.e., the Fischer Housing Project, but knew that "he didn't live there."[82] Petitioner states that this testimony is false because the unidentified caller who provided Graffeo with the name "George Jefferson" specifically informed, as set forth in Graffeo's supplemental report, that Jefferson "lived or frequented the area of 2000 Lebouef Ct." in the Fischer Housing Project.[83] Assuming *arguendo* that Graffeo was mistaken when he stated that the persons who contacted him with information regarding the identity of the second shooter represented that the shooter did not live in the Fischer Housing Project, the significance of such a mistake is negligible. However, as the Fourth Circuit observed, it is unlikely that Graffeo purposely testified falsely in light of the fact, as set forth in his supplemental report, that he "ran the name of George Jefferson, and the 2000 block of Lebouff [sic] Ct." through the computer, "but did not find any concrete information." *Crawford*, 848 So.2d at 630.[84]

### 4. Evidence of Innocence

Petitioner charges that "the single most important piece" of evidence suppressed by the State was "the fact that another, far more likely suspect was named as Lindsey's accomplice."[85] This evidence, referenced above, is the notation in Graffeo's supplemental police report that he received a telephone call from an unidentified black female who informed that the

---

[82]*See* State rec., vol. 3 of 5, trial transcript at p. 48.

[83]*See* petitioner's Exhibit A at Bates-stamped p. 430.

[84]*See also* petitioner's Exhibit A at Bates-stamped p. 430.

[85]*See* Federal rec., doc. #1, petitioner's supporting memorandum at p. 19.

first name of one of the shooters was "George", while his last name was possibly "Jefferson, but the female was not sure."[86]  Petitioner asserts:

> George Jefferson was a violent criminal who lived in Davis's apartment building
> at the Fischer project; she lived in apartment 1C, he lived in 3C.... He also fit
> every height, weight, race, and age description given by callers to the N.O.P.D.
> Furthermore, Jefferson's arrest record reveals a history of outrageous violence; the
> Bailes shooting was completely consistent with this history.[87]

As stated earlier, under *Brady, supra*, the State is required to disclose to the defense evidence which is favorable to the defense **and material to guilt or punishment**. Evidence is considered material only if it is reasonably probable that had the evidence been disclosed, the result of the proceeding would have been different.[88]  Information concerning an anonymous tip to the effect that someone named "George Jefferson" may have been one of the shooters, considered collectively with the other evidence which petitioner claims the State unconstitutionally suppressed, fails to satisfy the above-described materiality requirement as a result of the consistent eyewitness pre-trial and trial identifications of petitioner as the second shooter.[89]  Accordingly, petitioner is not entitled to federal habeas corpus relief.

---

[86]*See* petitioner's Exhibit A at Bates-stamped p. 430.

[87]*See* Federal rec., doc. # 1, petitioner's supporting memorandum at p. 19 (footnote omitted).

[88]*See* discussion *supra* at pp. 19-20.

[89]*See* discussions *supra* at pp. 23 and 29-30.

## C. INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner's last claim is that he was unconstitutionally denied effective assistance of counsel. In addressing this claim, the Louisiana Fourth Circuit Court of Appeal set forth the applicable law.

> The defendant's claim of ineffective assistance of counsel is to be assessed by the two-part test announced in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See State v. Fuller,* 454 So.2d 119 (La.1984). The defendant must show that his counsel's performance was deficient and that this deficiency prejudiced him. The defendant must make both showings to prove counsel was so ineffective as to require reversal. *State v. Sparrow,* 612 So.2d 191, 199 (La.App. 4 Cir.1992). Counsel's performance is not ineffective unless it can be shown that he or she made errors so serious that he or she was not functioning as the "counsel" guaranteed to the defendant by the 6th Amendment of the federal constitution. *Strickland, supra,* at 686, 104 S.Ct. at 2064. That is, counsel's deficient performance will only be considered to have prejudiced the defendant if the defendant shows that the errors were so serious that he was deprived of a fair trial. To carry his burden, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 693, 104 S.Ct. at 2068.

*Crawford,* 848 So.2d at 631-632, *quoting State v. Mims,* 769 So.2d 44, 72 (La. App. 4 Cir. 2000).

Petitioner first argues that counsel was ineffective due to his failure to obtain a copy of Mitchell's driver's license which reflected that Mitchell suffered from near-sightedness and was required to wear corrective lenses. Petitioner asserts that the driver's license could have been used to impeach Mitchell's ability to see his attackers.

The Fourth Circuit rejected petitioner's argument, concluding:

> There is no indication ... that there was any evidence to make counsel believe that
> Mr. Mitchell had any visual disability, which would have alerted counsel to the
> possibility that Mr. Mitchell had vision problems.  Nor is there any indication of
> whether or not Mr. Mitchell was wearing corrective lenses at the time of the
> shooting, be they glasses or contact lenses.  It cannot be said that counsel was
> ineffective for failing to obtain Mitchell's driver's license prior to trial.

*Crawford*, 848 So.2d at 632.  Petitioner, however, refutes the above conclusions, asserting that

"[c]ommon sense dictates" in a case "involving only eyewitness testimonial evidence" that an

investigation be undertaken with respect to the eyewitness's eyesight.  Further, because "a pair of

eyeglasses was found in Bailes's car", petitioner claims that counsel "could easily have argued

that the glasses were Mitchell's, and that because the glasses were not shattered or blood stained,

but were folded, Mitchell was not wearing them immediately prior to the shooting."[90]

In assessing an attorney's performance, every effort must be made "'to eliminate

the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged

conduct, and to evaluate the conduct from counsel's perspective at the time.'"  *Sterling v. Dretke*,

2004 WL 2664247, *2 (5th Cir. 2004), *quoting Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.  "It

is the petitioner who must overcome the presumption that defense counsel's performance fell

within the broad range of reasonable professional assistance."  *Id., citing Riley v. Cockrell,* 339

F.3d 308, 315 (5th Cir.2003).  Thus, arguments offered well "after the fact", regarding what

counsel could have argued, are not favored for the purpose of establishing ineffectiveness on

habeas corpus review.

---

[90]*See* Federal rec., doc. # 12, petitioner's reply to response to habeas corpus petition at pp. 12-13.

Alternatively, even if petitioner's argument regarding what "common sense dictated" and what counsel "could have argued" was sufficient to satisfy *Strickland's* deficiency prong, petitioner must still satisfy the prejudice prong. The court finds that petitioner was not prejudiced as a result of counsel's alleged deficiency in failing to apprise jurors of Mitchell's nearsightedness in light of the fact that Mitchell was not the only witness who identified petitioner as one of the shooters involved in the murder of Sherri Bailes. Shirley Davis, along with Mitchell, identified petitioner in a photographic lineup as well as at trial.

Petitioner next argues that counsel was ineffective due to his failure to obtain a "crime scene expert to testify that, based on the physical evidence found at the scene, the shooting could not have happened the way Davis described it." Petitioner elaborates that "[s]uch an expert could have shown that the presence of spent shell casings in the street, along with the steep angles of Bailes' bullet wounds, meant that the shooters fired from near Bailes' car, not from the porch."[91]

The above argument is without merit because it is based upon an incorrect assumption with regard to Davis' testimony. As noted earlier, contrary to petitioner's assertion, it was not Davis' testimony that the gunmen fired all of their rounds from the porch or the breezeway. Rather, Davis stated that the gunmen commenced firing as they were moving forward, off of the breezeway and onto the street where Bailes' car was located.[92]

---

[91] *See* Federal rec., doc. # 1, petitioner's supporting memorandum at p. 23,

[92] *See* discussion *supra* at p. 13.

39

Petitioner next argues that counsel was ineffective in failing to question Davis with respect to her "more than two-month delay in identifying [petitioner]".[93]  However, as the Fourth Circuit noted, "counsel did not pursue this line of questioning because of a ruling on a motion *in limine*, allegedly filed by [petitioner's] codefendant, which prohibited the State from mentioning threats made to Ms. Davis, unless either codefendant questioned her about this delay in contacting the police."  *Crawford*, 848 So.2d at 632.  Petitioner, however, counters that because there was no evidence to suggest that he, as opposed to his codefendant, ever threatened Davis, his counsel should have gone ahead and questioned Davis regarding the delay.

A definitive determination cannot be made with respect to whether or not petitioner's defense would have been hindered if the jury had heard testimony to the effect that Davis had been threatened by petitioner's codefendant.  However, the fact that petitioner's counsel apparently believed such testimony would be harmful and therefore chose not to question Davis regarding the above-referenced two-month delay, is a matter of trial strategy.  His decision in this regard cannot properly serve as a basis to support an ineffectiveness claim.  *See Johnson v. Dretke*, 394 F.3d 332, 337 (5th Cir. 2004).

Petitioner's next argues that prior to trial Davis testified that "[t]hey did the shooting coming from off the porch..." and the shooters "didn't get close to the car".  Petitioner contends that this testimony could have been used at trial to "lock [Davis] into her allegation that the shooters fired only from the porch or from the grassy area immediately in front of the porch"

---

[93]*See* Federal rec. doc. # 1, petitioner's supporting memorandum at p. 23.

then counsel could have contrasted Davis' "locked-in" version of events with Mitchell's version and the physical evidence on the scene, thereby discrediting Davis. However, once again, petitioner's argument is based upon a faulty assumption regarding Davis' testimony. As stated earlier, Davis never contended, either pre-trial or at trial, that all of the shooting occurred as the shooters were coming off the porch. Rather, this was all of the shooting that Davis witnessed. Once the shooters came off the porch and onto the street, Davis did not follow them. The shooters were no longer in Davis' field of sight.

Petitioner next claims that counsel's cross-examination of Detective Graffeo was "inadequate." Petitioner briefly elaborates: "Simply by comparing the transcript of the February 21, 1995 suppression hearing ... to the State's Answer ..., [counsel] could have determined that Graffeo testified falsely under oath prior to trial when he stated that Lindsey made no statements following his arrest; cross-examination of Graffeo on this point would have been highly damaging to Graffeo's credibility."[94]

The Fourth Circuit, in addressing the above claim, expounded upon the matter significantly more than petitioner.

> Crawford also asserts that his defense counsel was ineffective in his cross-examination of Detective Graffeo, the lead investigator in the murder. He first argues that if the defense counsel had compared Detective Graffeo's testimony at a pretrial hearing with the State's answer to his bill of particulars, the defense counsel could have discovered that Detective Graffeo testified falsely at the pretrial hearing when he stated that the codefendant did not give a statement to the police. Crawford contends that defense counsel could have used this information to impeach Detective Graffeo's credibility. He further avers that his defense

---

[94]*See* Federal rec., doc. # 1, petitioner's supporting memorandum at p. 24.

counsel could have presented evidence that Detective Graffeo first obtained
Crawford's name from his codefendant, rather than from a witness, and he
theorizes that his codefendant would have been much more likely to name an
innocent person (Crawford) as his accomplice rather than his real accomplice,
who could have given the police information damaging to him.  Crawford asserts
that cross-examination of Detective Graffeo on this point would have cast great
doubt on the thoroughness of his investigation.

*Crawford*, 848 So.2d at 633 (quotation omitted).

The state appellate court ultimately rejected petitioner's claim, implicitly finding

that he failed to make the requisite showing of prejudice.  Specifically, the court reasoned:

It is true that Detective Graffeo did not mention that he had received
Crawford's name from Lindsey; Detective Graffeo only testified that "[d]uring my
investigation I found that the last name of the subject was George Crawford."  It is
not clear how the jury's learning that Detective Graffeo got Crawford's name from
Lindsey would somehow make it appear that Detective Graffeo's investigation
was incomplete.  Detective Graffeo may have initially obtained Crawford's name
from Lindsey, but **the fact remains that both Mr. Mitchell and Ms. Davis
identified Crawford in photographic lineups and at trial**.  In addition, the fact
that Detective Graffeo testified at a pretrial hearing that Lindsey did not make a
statement would not, as theorized by Crawford, have so damaged the detective's
credibility as to make his testimony unbelievable or to have made the jury find
that his investigation of the case was incomplete.

*Crawford*, 848 So.2d at 633 (emphasis added).  Because the above reasoning does not constitute

an unreasonable application of *Strickland* to the facts of this case, petitioner's claim for habeas

corpus relief is without merit.

Petitioner next complains that counsel was ineffective by virtue of the fact that he

fell asleep at trial.  In support of his claim, petitioner provides a single affidavit, from his mother,

who claims that she observed counsel sleeping.[95]  Petitioner also cites, in support of his claim, a

single case, *Burdine v. Johnson*, 262 F.3d 336 (5th Cir. 2001), *cert. denied*, 535 U.S. 1120, 122

S.Ct. 2347, 153 L.Ed.2d 174 (2002), wherein a habeas petitioner was successful in connection

with his bid for habeas corpus relief based upon his claim that counsel fell asleep at trial.

However, as shown below, *Burdine* is distinguishable from the instant matter.

In *Burdine*, 262 F.3d at 339, the Fifth Circuit, following its review of the

testimony provided at a state evidentiary hearing, noted:

> Burdine called eight witnesses, including three jurors from the capital murder trial
> and the clerk of the court in which the trial was held.  These four neutral
> witnesses, which the state habeas court found highly credible, testified that
> [counsel] repeatedly dozed or slept as the State questioned witnesses and
> presented evidence supporting its case against Burdine.

In contrast, petitioner's claim that defense counsel fell asleep during trial is "supported only by

the affidavit of [his] mother", a fact which led the Louisiana Fourth Circuit to conclude that "the

trial court did not err in failing to give credit to this claim".  *Crawford*, 848 So.2d at 633.

Based upon the above, the court finds that petitioner's reliance upon *Burdine* is

misplaced.  The evidence supporting Mr. Burdine's ineffectiveness claim was significantly more

substantial than the single affidavit offered by petitioner.  Accordingly, his claim for habeas relief

is without merit.

Finally, petitioner claims that counsel was ineffective due to his failure to move

for a directed verdict based upon the State's failure to present sufficient evidence to support his

conviction.  However, in connection with this claim, petitioner cannot satisfy either of

---

[95]*See* petitioner's Exhibit A at Bates-stamped p. 506.

*Strickland*'s prongs given this court's finding that the State, in fact, did submit sufficient evidence to support petitioner's conviction.[96]

## RECOMMENDATION

For the reasons set forth above, **IT IS HEREBY RECOMMENDED** that George Crawford's petition for issuance of a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 be **DENIED.**

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this _16th_ day of _March_, 2005.

LOUIS MOORE, JR.
United States Magistrate Judge

---

[96]*See* discussion *supra* at pp. 10-18.