UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GEORGE CRAWFORD                           CIVIL ACTION

VERSUS                                    NO. 04-0748

BURL CAIN, WARDEN                         SECTION "R"(6)

## ORDER AND REASONS

Before the Court are petitioner George Crawford's objections to the magistrate judge's Report and Recommendation denying his application for a writ of habeas corpus.  For the following reasons, the Court accepts the magistrate judge's Report and Recommendation and DENIES Crawford's application for habeas relief.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Shortly after 2:00 p.m. on September 22, 1994, Elijah Mitchell was sitting in his girlfriend Sheri Bailes's black Corvette near the 2000 block of Thayer Street in the Fischer Housing Project in Algiers, Louisiana.  Two men approached and began shooting into the car.  Bailes was shot twice and was

pronounced dead at the Medical Center of Louisiana at 3:10 p.m.
Mitchell was shot a number of times, but he eventually recovered.

Detective Anthony Graffeo of the New Orleans Police
Department arrived at the scene and discovered an area of Thayer
Street spread with broken glass, eight spent nine millimeter
shell casings, one live nine millimeter round, and a black and
white baseball hat with a bullet hole through its peak.  The hat
was later identified as the hat Mitchell was wearing at the time
of the shooting.  Ballistics tests later showed that the casings
had been ejected from two different guns.

About 270 feet down the street, Detective Graffeo found
Bailes's black Corvette off the road, canted into the bushes.
The T-top of the Corvette was down, the back windshield was
broken out, and there was one spent nine millimeter casing in the
passenger side of the car.  Blood covered both the driver's and
passenger's seats.  A white rock, which was later determined to
be cocaine, was wrapped in cellophane on the front seat.  The
police searched the scene and canvassed the neighborhood but were
unable to find any weapons or any witnesses willing to give a
statement.

The next day, Detective Graffeo received a call from Shirley
Davis, a resident of the Fischer Housing Project who said she
witnessed the shooting.  Davis told Graffeo that she recognized

2

one of the gunmen as Larry Lindsey, who was her sister's former boyfriend; the other she knew only as "George."  With the name Larry Lindsey, Detective Graffeo was able to compile a photo array, from which Davis identified Lindsey.  Davis also gave a tape recorded statement, which was not disclosed to the defense before trial.  Based on Davis's identification, a warrant was issued for Lindsey's arrest.  Lindsey was arrested on October 6, 1994.  When Lindsey was arrested, he stated that he was not present at the time of the shooting but that he had heard that the perpetrator was a black male by the name of George Crawford. Based on this information, Graffeo compiled a photo array that included a picture of George Crawford.

By October 6, 1994, Elijah Mitchell had recovered enough to be interviewed by the police.  Mitchell told police that he had seen both gunmen during the shooting and that he knew both of them.  He identified pictures of Larry Lindsey and George Crawford from the photo arrays that Detective Graffeo presented to him.  Based on Mitchell's identification, an arrest warrant was issued for George Crawford.  Mitchell also gave the police a tape-recorded statement, which was not disclosed to the defense before trial.

On December 1, 1994, Detective Graffeo's partner, Detective Gary Marchese, presented Shirley Davis with another photo array.

3

At that time, Davis identified George Crawford as the second shooter.

On June 1, 1995, Larry Lindsey and George Crawford were charged with the first-degree murder of Sheri Bailes. Both men pleaded not guilty. The case went to trial on January 7, 1997. There was no physical evidence tying Lindsey or Crawford to the crime, and the prosecution based its case principally on the testimony of Shirley Davis and Elijah Mitchell, as well as their pretrial photographic identifications of Lindsey and Crawford. Their trial testimony was as follows.

Shirley Davis testified that on September 22, 1994, she lived at 1020 LeBoeuf Court, Apartment 1C, in the Fischer Housing Project. As she was parking her car in the driveway that afternoon, she noticed a car behind her. She recognized the car's occupants as Larry Lindsey and a person she had seen before in the project, but knew only as George. She said she had known Lindsey a long time and that he used to see one of her sisters, with whom he had a child. She said that she had seen George around the project for a couple of months.

Davis testified that both men had bandanas over their mouths and had large guns in their hands. She testified that Lindsey wore a purple hooded sweatshirt and long blue jeans and that George wore a long-sleeve dark sweatshirt and jeans. She watched

4

the men go through a breezeway between two buildings toward
Thayer Street, and she then heard her mother yelling for her from
the other side of the breezeway, along with several gunshots.  As
Davis moved toward the breezeway, she could see the men shooting
and at some point she came to a position to see that the shooting
was aimed at two people in a black Corvette.  The Corvette ended
up in the grass by a fence.  She then saw the two shooters walk
back through the breezeway to their car, back up, and leave.
Davis testified that she then went inside her apartment.

Davis also testified that her aunt, who was with her in her
car when she arrived, her mother, and several of her cousins, who
were shooting dice in the breezeway, also witnessed the shooting,
but did not talk to police.  Davis testified that she spoke with
police the next day and told them that Larry Lindsey was one of
the perpetrators and that the other was named George, but that
she did not know his last name.  She confirmed that she picked
Larry Lindsey out of the photo array and said that the police did
not promise her anything for doing so.  She also confirmed that
several months later she picked George Crawford's picture out of
a second photo array and said that, by that time, she had found
out from other people in the project that his last name was
Crawford.  She also stated that she picked Crawford out of the
photo array without being promised anything by the police for

doing so.

Mitchell, who was serving a sentence in Texas state prison for a probation violation at the time of trial, testified at trial that he had gotten into Bailes's car shortly before the shooting.  Bailes was sitting in the driver's seat, Mitchell was sitting in the passenger seat, and the two were facing each other, arguing.  Mitchell noticed that someone was walking toward the car on the passenger side.  As Mitchell turned around to see who it was, he was shot in the right side of the head.  Mitchell testified that then he turned around completely and saw that the gunmen were Larry Lindsey and George Crawford.  Mitchell stated that Lindsey had a black bandana over his mouth, wore dark blue shorts and a black sports jersey, and was armed with a Tek-9. Crawford, who Mitchell said was not wearing a bandana over his mouth, had on a light colored shirt and either tan or khaki pants, the length of which Mitchell could not recall.  He said that Crawford was armed with a smaller weapon.  Mitchell was shot several more times, including twice in the face.  At some point during the shooting, Bailes apparently depressed the accelerator, and the car drove forward 30 or 40 yards and rolled off the road.

Mitchell testified that he was able to recognize both men because he had known them for about a month or a month and a half and had been in several arguments with them.  He said that

Crawford and Lindsey lived together around the block from him in Gretna.  He also testified that Lindsey and Crawford had threatened him after a confrontation two days before the shooting.  He testified that whenever he saw Lindsey, Crawford was with him.  Mitchell confirmed that he had identified both men in photo arrays that the police presented to him on October 6, 1994.

At trial, the defense presented a single witness, an investigator who testified that the distance from the edge of breezeway to where Bailes's car was when the shooting took place was 53 feet.  Crawford and Lindsey were convicted of first-degree murder.  The next day, both men were sentenced to life in prison without the possibility of parole.

Crawford appealed his conviction.  On March 10, 1999, the Fourth Circuit Court of Appeal affirmed the conviction and life sentence in an unpublished opinion.  *State v. Lindsey*, 737 So. 2d 978 (La. Ct. App. 1999).  On October 15, 1999, the Louisiana Supreme Court denied Crawford's writ application.  *State v. Lindsey*, 748 So. 2d 463 (La. 1999).

Crawford applied for post-conviction relief in the state trial court on October 12, 2000.  The trial court denied relief on July 11, 2002, and Crawford timely filed notice of intent to seek writs.  The Louisiana Fourth Circuit Court of Appeal denied

post-conviction relief on February 12, 2003.  *State v. Crawford*, 848 So. 2d 615 (La. Ct. App. 2003).  Crawford timely requested rehearing, which was denied on March 14, 2003.  On April 14, 2003, Crawford filed a writ to the Louisiana Supreme Court, which was denied on March 12, 2004.  *State v. Crawford*, 869 So. 2d 815 (La. 2004).

On March 15, 2004, Crawford filed a petition in this Court for a writ of *habeas corpus*.  Crawford asserts three claims: (1) that the evidence at trial was insufficient to support his conviction; (2) that he was denied due process because the prosecution withheld from the defense material exculpatory and impeachment evidence; and (3) that he was denied effective assistance of counsel at trial.  The State argues that Crawford's habeas application is untimely and that, in any event, his claims should be denied on the merits.  The magistrate judge reviewing Crawford's federal habeas petition determined that Crawford's petition was timely but that it should be dismissed on the merits.  Crawford objects to the magistrate's report and recommendation that his petition be dismissed.


## II.  TIMELINESS

Congress enacted a strict statute of limitations for *habeas corpus* proceedings as part of the Antiterrorism and Effective

Death Penalty Act of 1996 (the "AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (effective April 24, 1996). Under the AEDPA, "[a] 1-year period of limitation shall apply to an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1). The one-year period runs from the "date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). Direct review includes a petition for certiorari to the United States Supreme Court. *Foreman v. Dretke*, 383 F.3d 336, 338 (5th Cir. 2004) (citing *Roberts v. Cockrell*, 319 F.3d 690, 694 (5th Cir. 2003)). If no such petition is filed, then the conviction becomes final when the time for seeking direct review expires. *Foreman*, 383 F.3d at 338. If a defendant has pursued his direct appeal through the highest state court, the time for seeking direct review includes the 90 days for filing a petition for certiorari to the Supreme Court. *Id.* If not, then it includes only the time for seeking further state-court direct review. *Id*.

Here, Crawford's conviction was on direct review in the state courts until October 15, 1999, when the Louisiana Supreme Court denied his writ application. Crawford did not file a petition for review in the United States Supreme Court, so his

conviction became final 90 days later, on January 13, 2000.[1]
Thus, the one-year statute of limitations expired on January 13,
2001, and Crawford's federal *habeas* petition, which he filed in
this Court on March 15, 2004, is untimely unless the limitation
period was statutorily or equitably tolled.

AEDPA's one-year statute of limitations is statutorily
tolled for the period of time during which a properly filed
application for state post-conviction relief or other collateral
review of the judgment under which the petitioner is incarcerated
is pending. 28 U.S.C. § 2244(d)(2); *see Moore v. Cain*, 298 F.3d
361, 365-67 (5th Cir. 2002). Crawford did not file an
application for state post-conviction relief until October 12,
2000, so 272 days of his 365-day limitation period elapsed.
Crawford's properly filed application for post-conviction relief
tolled the statute of limitations from October 12, 2000 to March
12, 2004, when the Louisiana Supreme Court denied his writ
application.[2] Only three more days passed before Crawford filed

---

[1]The State's argument that Crawford's petition is untimely
relies in part on its failure to include this 90-day period.

[2]In its response to Crawford's petition, the State argued
that Crawford's writ application to the Louisiana Supreme Court
was untimely. If the state is correct, then Crawford's petition
would be untimely, because the AEDPA's one-year limitations
period is not tolled during the pendency of an untimely
application for post-conviction relief in the state courts. *See
Pace v. DiGuglielmo*, 544 U.S. 408, 414 (2005). In this case,

his federal *habeas* petition.  Accordingly, the Court finds that Crawford's federal *habeas* application is timely and proceeds to consider the merits of his claims.

## III. DISCUSSION

The state courts rejected Crawford's post-conviction application for relief on the merits.  *See State v. Crawford*, 848 So. 2d 615 (La. Ct. App. 2003).  Under AEDPA, a state court's findings of fact are entitled to a presumption of correctness, rebuttable only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  A federal *habeas* court may not grant a state prisoner's application for a writ of *habeas corpus* with respect to claims adjudicated on the merits in state court unless the state court decision "was contrary to, or involved an

---

Crawford had until April 13, 2003 to file his writ application with the Louisiana Supreme Court.  Although he did not file his application until April 14, 2003, as the magistrate judge noted, April 13, 2003 was a Sunday.  Under Louisiana law, petitioner had until the next business day, April 14, 2003 to file his writ application.  *See Lambert v. Mutual Life Ins. Co. of New York*, 431 So. 2d 23, 24 (La. Ct. App. 1983) ("It is well settled in Louisiana that when the last day of the term by law for taking any stated action in a judicial proceeding falls on a Sunday or other legal holiday, the action may be taken on the next day following, as effectively as if taken on the day before the last day of the term.") (citing *Mansur v. Abraham*, 183 La. 634 164 (1935)).  Accordingly, Crawford's writ application was timely filed.  The State has not objected to the magistrate judge's ruling on this point.

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id.* § 2254(d)(1). This section provides two potential avenues for relief: the petitioner must show that the state court construction was either "contrary to" federal law or an "unreasonable application" of it.

A state court decision is "contrary to" clearly established federal law if: (1) the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or (2) "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

A state court decision involves an "unreasonable application" of clearly established federal law if: (1) "the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case," or (2) the state court "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407-08. "[A] federal habeas

court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable," not just incorrect or erroneous. *Id*. at 409-11. Accordingly, the Court must determine whether the Louisiana state court misapplied a federal standard or whether the court's decision that Crawford did not demonstrate constitutional error is an objectively unreasonable legal conclusion.

### A.   Sufficiency of the Evidence

Crawford argues that the evidence presented at trial was insufficient to support his conviction. In evaluating a petitioner's challenge to the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citation omitted). In making this determination, the Court must resolve all credibility issues in favor of the prosecution. *See Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005) (citing *United States v. Cyprian*, 197 F.3d 736, 740 (5th Cir. 1999)). When, as in this case, a state appellate court has reviewed the sufficiency of the evidence, that court's opinion is

13

entitled to great weight.  *See Parker v. Procunier*, 763 F.2d 665, 666 (5th Cir. 1985) (citing *Jackson*, 443 U.S. at 310, n.15); *see also Duff-Smith v. Collins*, 973 F.2d 1175, 1184 (5th Cir. 1992). Indeed, as indicated above, the AEDPA presumes the correctness of state court findings of fact, and places a "clear and convincing" burden on the petitioner who attempts to rebut that presumption. *See* 28 U.S.C. § 2254(e)(1).

Crawford argues that Davis's and Mitchell's stories were so contradictory that their testimony was "mutually exclusive" and the jury thus "had no choice except to believe one version of the shooting or the other."  Crawford further asserts that no rational jury could have convicted him based solely on the testimony of either Davis or Mitchell, so the state court's determination that the evidence adduced at trial was sufficient to support his conviction was an unreasonable application of federal law.

The state court's decision was not an objectively unreasonable application of federal law.  The state court applied the correct legal standard, analyzed the testimony of Davis and Mitchell, and concluded that their testimony was not mutually exclusive. *Crawford*, 848 So. 2d at 623.  The court found that the jury was entitled to credit Davis's and Mitchell's testimony that George Crawford was one of the shooters, and that this

14

evidence was sufficient to convict, notwithstanding that their testimony was not entirely consistent. *Id.* The Court cannot conclude that this was an unreasonable application of *Jackson*. A rational jury presented with testimony from two eyewitnesses who differ with respect to certain details need not resolve the conflict by adopting wholesale the testimony of one witness and rejecting entirely the testimony the other. The jury was entitled to credit both witnesses' identification of Crawford as one of the shooters. Accordingly, Crawford is not entitled to relief on this claim.

> **B.** ***Brady* Claim**

Crawford next argues that the state violated his right to due process when it failed to disclose material favorable evidence before trial that would have permitted him to impeach the prosecution's witnesses, question the thoroughness of the police investigation, and establish a possible alternative suspect for the crime.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

373 U.S. at 87.  The Court has since abandoned any requirement
that a defendant request the disclosure of favorable evidence,
and the *Brady* standard now applies regardless of whether the
defendant specifically requests the information.  *Kyles v.
Whitley*, 514 U.S. 419, 433 (1995) (citing *United States v.
Bagley*, 473 U.S. 667, 682 (1985)).  To establish that the state's
failure to disclose evidence violates *Brady*, a petitioner must
demonstrate that: (1) the prosecution withheld evidence; (2) the
evidence is favorable to the accused; and (3) the evidence is
material to guilt or punishment.  *Bagley*, 473 U.S. at 674.
Evidence "favorable to an accused" for the purposes of *Brady*'s
second prong is not limited to evidence that is exculpatory.
Evidence that could be used to impeach a prosecution witness also
falls within *Brady*'s disclosure requirement.  *Id*. at 676-77;
*Felder v. Johnson*, 180 F.3d 206, 212 (5th Cir. 1999).  Evidence
may be material under *Brady* even if it is not admissible.  *See
United States v. Sipe*, 388 F.3d 471, 485 (5th Cir. 2004) ("When
assessing the materiality of inadmissible evidence, we apply the
general *Brady* test and 'ask only . . . whether the disclosure of
the evidence would have created a reasonable probability that the
result of the proceeding would have been different.'") (quoting
*Felder*, 180 F.3d at 212) (ellipsis in original).

　　　Undisclosed favorable evidence is material under *Brady* "if

16

there is a reasonable probability that, had the evidence been
disclosed to the defense, the result of the proceeding would have
been different." *Kyles*, 514 U.S. at 433 (citation omitted).  In
*Kyles*, the Supreme Court identified four key aspects of the *Brady*
materiality inquiry.  First, to show materiality, the defendant
need not demonstrate by a preponderance of the evidence that
disclosure of the withheld evidence would have resulted in
acquittal.  *Id.* at 434.  "The question is not whether the
defendant would more likely than not have received a different
verdict with the evidence, but whether in its absence he received
a fair trial, understood as a trial resulting in a verdict worthy
of confidence."  *Id.*  Second, the materiality determination "is
not a sufficiency of evidence test."  *Id.*  The relevant inquiry
is not whether the inculpatory evidence, discounted in light of
the undisclosed evidence, would still have been enough to
convict, but whether "the favorable evidence could reasonably be
taken to put the whole case in such a different light as to
undermine confidence in the verdict."  *Id.* at 435.  Third, if the
withheld evidence is material, there is no need to conduct a
harmless-error analysis.  *Id.* at 435-36.  Finally, the withheld
evidence must be considered collectively, not item-by-item.  *Id.*
at 436.  Although a court must consider "the tendency and force
of the undisclosed evidence item by item," it should evaluate the

evidence's "cumulative effect for purposes of materiality." *Id*. at 436 n.10.

There is no dispute that the defense made a targeted request for potential *Brady* material, and the prosecution did not disclose the following items to the defense: (1) a supplemental police report prepared by Detective Graffeo (Petr.'s Ex. A, Vol. 2, Tab D, Foker Aff., Ex. B. (*hereinafter* "Foker Aff."); (2) the transcript of a pretrial statement given by Shirley Davis on September 23, 1994, *Id*. Ex. H; (3) the transcript of a pretrial statement given by Elijah Mitchell on October 6, 1994, *Id*. Ex. K; (4) a log of 911 calls reporting the shooting, *Id*. Ex. C; and (5) Mitchell's medical records from the day of the shooting, *Id*. Ex. L. Crawford did not object to the Magistrate's ruling that the state court correctly found the medical report immaterial. Accordingly, this argument is waived. The Court must now analyze the state court decision under the constitutional standards discussed above. In reaching its decision, the Court has reviewed the trial transcript, all of the undisclosed evidence, and other parts of the 14 volume record.

1.   *Favorable to the Accused*

a.   *The Supplemental Police Report*

Crawford identifies three purportedly favorable statements

18

from Detective Graffeo's supplemental police report that he
claims should have been disclosed to the defense:  (1) that when
Shirley Davis initially called the police, she stated that the
perpetrators were Larry Lindsey and George *Ascort*; (2) that
Shirley Davis stated that "she would come forward and give a
statement only if she could be relocated from the Fisher Housing
Project"; and (3) that, on the morning after the shootings, an
anonymous caller informed Detective Graffeo that the second
shooter's name was possibly George *Jefferson,* and that he lived
in or frequented the 2000 block of LeBoeuf Court, in the Fisher
Project.  (*See* Foker Aff. Ex. B, at 13)

Pretermitting for the moment any consideration of whether
these undisclosed statements are material, each statement is
favorable to Crawford.  Shirley Davis' initial statement
identifying George Ascort as the second shooter could have been
useful to attempt to undermine her statement at trial that she
did not know George's last name at the time of the shooting or
when she first spoke to police.  (*See* State Ct. R., Vol. 3 of 5,
Trial Tr. at 110, 115, 120-22).  That Davis asked to be relocated
to another neighborhood before she was willing to give a
statement could have been used by the defense to attempt to
establish that Davis had a motive to fabricate her statement that

she saw the shooting.[3]  Finally, that another person identified
the George involved with the shootings as George Jefferson is
clearly favorable to the accused.  Thus, each of the complained-
of statements in the supplemental police report satisfies the
first prong of the *Brady* inquiry.

      b.   *Shirley Davis's Pretrial Statement*

     Crawford asserts that a number of statements that Shirley
Davis made in her initial statement to police would have been
useful to impeach her credibility at trial.

     First, Crawford states that although Davis testified at
trial that she did not know George's last name when she first met
with the police,[4] she gave the police the name George *Caldwell*
during her initial interview.  (*See* Foker Aff. Ex. H, at 7).  As
with Davis's statement identifying a George Ascort, this
statement could have been used in an effort to impeach Davis's
trial testimony, and it could also have been used to attack
Detective Graffeo's testimony at trial that Davis "didn't have a
last name" on the second shooter at the time she was interviewed.

---

[3]Crawford also argues that Davis's request that she be
relocated is favorable because it could be used to show that
Davis gave perjured testimony at trial.  The Court discusses this
argument *infra*.

[4](*See* Trial Tr. at 115, 119-20).

(*See* Trial Tr. at 48).  Accordingly, the statement is favorable to Crawford.

Second, Crawford notes that Davis provided conflicting descriptions of the perpetrators' clothing in her pretrial statement and her trial testimony.  In her initial meeting with police, Davis stated that Larry Lindsey was wearing a dark colored shirt and George was wearing a purple and white long-sleeve shirt with a hood at the time of the shooting.  (*See* Foker Aff. Ex. H, at 2, 7).  At trial, however, Davis testified that Larry Lindsey was wearing the purple, hooded sweatshirt and that George Crawford wore a dark, long-sleeve sweatshirt.  (*See* Trial Tr. 139-40).  This inconsistency as to who wore what at the time of the shooting is also favorable to the defense under *Brady*.

Third, Crawford states that Davis's trial testimony that the shooters had guns in their hands when they got out of the car[5] contradicts her pretrial statement that "you couldn't really tell they had guns on them when they first got out the car."  (*See* Foker Aff. Ex. H, at 3).  These statements do not necessarily conflict with one another.  Davis's pretrial statement, when read in context, suggests that the shooters had the guns in their hands as they exited the car, but that they carried the guns in a

---

[5](*See* Trial Tr. at 110).

manner intended to not attract attention until they got through the breezeway:  "[Y]ou *couldn't really* tell they had guns on them when they first got out the car . . . and when they went through the breeze-way they *up with the guns* and ran up on the car and started shooting."  *Id.* (emphasis added).  Although this Court harbors some doubt as to whether these two statements actually conflict, and whether Davis' pretrial statement is therefore favorable evidence under the first prong of *Brady*, the state court appears to have found that the statements conflicted, but that the conflict would not have affected Davis' credibility.  *See Crawford*, 848 So. 2d at 629 ("The . . . discrepanc[y] concerning . . . whether the guns were in the perpetrators' hands as they exited their car [is a] distinction[] that would not harm her credibility.").  The Court defers to the state court's factual finding that there was some inconsistency between the two statements and finds that this statement satisfies the first *Brady* prong.

Fourth, Crawford asserts that Davis's pretrial statement and her trial testimony about the shooting itself were different. Specifically, Crawford states that, in her pretrial statement, Davis said that she saw the perpetrators run up on the car and

start shooting,[6] while at trial she said that she saw them start shooting when they reached the end of the breezeway, but that she did not see initially at what they were shooting.  (Trial Tr. at 112).  Crawford also asserts that Davis initially stated that she saw Bailes's car swerve into the grass,[7] but that her trial testimony forecloses such a possibility.  As the magistrate judge correctly found, however, Davis' pretrial statement and her trial testimony concerning the sequence of events during the shooting were "essentially in sync."  (R. Doc. 13, at 26-27).  Davis stated both in her pretrial statement and at trial that the perpetrators started shooting from the breezeway.  (*See* Foker Aff. Ex. H, at 4 ("They both was like, you know where the breeze-way at, they was like right there."); Trial Tr. at 112 ("When they got to the front [of the breezeway] that's when they had started shooting."); Trial Tr. at 145 ("They came up off the porch.")).  Moreover, contrary to Crawford's assertions, Davis testified at trial both that there came a time when she was in a position to see what the perpetrators were shooting at and that she saw that Bailes's car wound up in the grass:

> Q.  Now, did there come a time when you got a position to see where the shooting was aimed

---

[6](*See* Foker Aff. Ex. H, at 3).

[7](*See* Foker Aff. Ex. H, at 4).

> at?  Could you see what was being shot?
>
> A.  Yes.
>
> Q.  Okay.  And what was being shot?
>
> A.  Two people in a black Corvette.
>
> Q.  Okay.  Did you see where that Corvette ended up?
>
> A.  Yes, in the grass by the fence.

(Trial Tr. at 113).  Thus, the magistrate judge was correct that Davis's pretrial statements about the sequence of events during the shooting do not constitute evidence favorable to Crawford.

Fifth, Crawford argues that Davis's testimony that her aunt was with her at the time of the shooting and that some of her cousins were among the people who were in the breezeway at the time of the shooting[8] contradicted her pretrial statement that there was just "[a] crowd of people from the area" present when the shooting took place.  (*See* Foker Aff. Ex. H, at 8).  The state court found that Davis's pretrial statement was favorable to the defense because it implied that she did not know any of the other witnesses, but that the contradiction was nonetheless immaterial to Davis's credibility.  *See Crawford*, 848 So. 2d at 629.  The Court finds no reason to depart from the state court's determination that this part of Davis's pretrial statement

---

[8](*See* Trial Tr. at 111, 132).

24

contradicted her testimony at trial and was favorable to the
defense.

Sixth, Crawford asserts that before trial, Davis stated that
she went up to the car and observed the victims after the
shooting was over,[9] while at trial she stated that she
immediately went inside after the shooting.  (*See* Trial Tr. at
114).  It is not clear that Davis's statement at trial that she
went inside immediately after the shooting implies that she did
not later come outside and observe the car after the perpetrators
had left the scene.  Still, this arguable inconsistency could
have been potentially useful for defense counsel's cross
examination of Davis and is therefore favorable to Crawford.

Finally, Crawford argues that Davis's pretrial statement
that she observed Elijah Mitchell "gasping for breath" and unable
to speak after the shooting,[10] could have been used to undermine
Mitchell's testimony that he would have been able to give a
statement to police when they arrived on the scene.  What Davis
actually said was that she saw Mitchell "gasping for breath and
trying to say something out his mouth."[11]  What Mitchell said at

---

[9](*See* Foker Aff. Ex. H, at 4).

[10](*See* *Id.*).

[11]*Id.*

25

trial was that he was conscious, and no one asked him for a statement.[12]  He did not say that he could have given a statement.  Davis's statement that Mitchell was "trying to say something out his mouth" is consistent with Mitchell's testimony that he was conscious after the shooting.  This statement is not *Brady* material.

    c.   *Elijah Mitchell's Pretrial Statement*

Crawford also argues that Elijah Mitchell's initial statement to police contained a number of statements that could have been used to impeach his testimony at trial.  As with Davis's statement, the Court considers each of Crawford's arguments in turn.

First, Crawford argues that, although Mitchell testified at trial that he knew George's last name at the time of the shooting,[13] the transcript of his pretrial statement shows that he said he did not know George's last name.  (*See* Foker Aff. Ex. K, at 3) ("I don't know George['s] last name . . . .").  This portion of Mitchell's pretrial statement was favorable to Crawford, as it conflicts with Mitchell's trial testimony.

---

[12](*See* Trial Tr. at 95).

[13](*See* Trial Tr. at 81).

Second, Crawford argues that Mitchell's trial testimony that the two perpetrators shot him from the side, not the rear, of Bailes's car[14] conflicts with his initial statement to police. In his recorded pretrial statement, Mitchell stated that Larry Lindsey was "straight outside" the passenger door of the car, to Mitchell's east, while "George was more like . . . as he was to the east he was like to the south," farther toward "the rear of the vehicle." (*See* Foker Aff. Ex. K, at 5). But, as the state court noted, although Mitchell's pretrial statement places George closer to the rear of the vehicle than Larry Lindsey, it still places him on the passenger side, and the statement does not therefore conflict with Mitchell's trial testimony. *See Crawford*, 848 So. 2d at 626. Accordingly, this statement does not constitute evidence favorable to the defense.

Third, Crawford asserts that Mitchell's pretrial statement that Lindsey used a 9mm gun and the second shooter used a "small caliber gun"[15] could have been used to impeach Mitchell's trial testimony, because the ballistic evidence established that both weapons involved in the shooting were 9mm. Although the state court correctly found that Mitchell's pretrial statement about

---

[14](*See* Trial Tr. at 89).

[15](*See* Foker Aff. Ex. K, at 4).

27

the small caliber gun did not actually conflict with his trial
testimony, the state court failed to consider whether the
statement could have been used to impeach the accuracy of
Mitchell's recollection, because the prosecution's ballistics
evidence foreclosed the possibility that one of the shooters used
a small caliber weapon.  The statement is favorable to the
defendant for this purpose.

      d.   *The 911 Log*

    Crawford argues that the prosecution also should have
disclosed the 911 log because it contained two statements that
could have been used to contradict the prosecution's witnesses at
trial.  First, the log shows that one caller described a
perpetrator as wearing a "multi stripe hooded shirt," and another
stated that the two perpetrators wore "a multicolor shirt and
green pants" and "a colorful shirt and black jeans,"
respectively.  (*See* Foker Aff. Ex. C).  This evidence is
favorable to Crawford because it is inconsistent with Mitchell's
testimony that the second shooter was dressed in a light colored
shirt and tan pants.  (*See* Trial Tr. at 86).

    Second, the 911 log shows that one caller reported that the
shooters were "running up the breezeway [sic]."  (*See* Foker Aff.
Ex. C).  Crawford claims that this statement is favorable because

28

it conflicts with Davis's trial testimony that the perpetrators *walked* back through the breezeway after the shooting.  (Trial Tr. at 113-14).  Although the statement from the 911 log is consistent with Davis's general account that the shooters left via the breezeway, it does conflict with Davis's testimony insofar as she specifically stated that the shooters walked, and did not run, back up the breezeway after the shooting.

2.  *Materiality*

The Court has determined that the supplemental police report,  the two witness statements and the 911 log contain information favorable to the defense.

But the Court's finding that these pieces of evidence are favorable to Crawford only begins the inquiry.  The prosecution was required to disclose this evidence only if the evidence is material.  As discussed above, evidence favorable to the accused is material under *Brady* only if there is a reasonable probability that its disclosure would have resulted in a different outcome, or, in other words, if the prosecution's failure to disclose the evidence undermines confidence in the jury's verdict.  *See Kyles*, 514 U.S. at 433-34.  The Court must consider the materiality of *Brady* evidence cumulatively, in light of the record as a whole. *Id.* at 436-37.

Crawford argues that the Louisiana Fourth Circuit Court of Appeal did not consider the materiality of the undisclosed evidence collectively, which renders its decision contrary to clearly established federal law.  As noted, a decision is contrary to clearly established federal law if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases, or reaches a decision different from Supreme Court precedent on materially indistinguishable facts.  *Williams*, 529 U.S. at 406.  The Court finds that the state court did neither.  The Louisiana state court cited the relevant *Brady* materiality precedent from the United States Supreme Court.  It quoted from *Kyles*, *supra*, at length.  *Crawford*, 848 So. 2d at 624.  It cited *United Stated v. Agurs*, 427 U.S. 97 (1976), as well as *United States v. Bagley*, 473 U.S. 667, which is the case the Supreme Court cited as the source of the cumulative review requirement.  *Crawford*, 848 So. 2d at 624-26; *see also Kyles*, 514 U.S. at 436-37.  The state court did not state a rule of law inconsistent with these cases.  It is true that the state court did not recite the specific language from *Kyles* that the evidence must be "considered collectively, not item by item."  *Kyles*, 514 U.S. at 436.  The state court did, however, state that the evidence had to "be evaluated in the context of the entire record."  848 So. 2d at 625.  Furthermore, although the state

30

court did discuss the categories of evidence individually, the
*Kyles* Court indicated that it is appropriate to do so to
determine the tendency and force of the evidence.  514 U.S. at
436 n.10.  Finally, the state court concluded its inquiry with a
discussion of the impact of "withholding the information" on the
state's case, apparently referring to the "statements and other
documents" together.  848 So. 2d at 631.  It concluded that these
materials would not have damaged the credibility of the
witnesses' identification of Crawford because neither witness was
identifying an unknown person, but rather someone they knew
previously who had been in the area.  *Id.*  It also reasoned that
the jury was aware that the police had the names of several
Georges. *Id*.  Based on the foregoing discussion of the state
court opinion, this Court concludes that the state court did not
apply a rule of law contradicting Supreme Court precedent.
Crawford may still be entitled to relief, however, if he shows
that the state court's decision was an unreasonable application
of clearly established federal law.   To do so, he must show that
the state court's application of clearly established federal law
was objectively unreasonable, not just incorrect or erroneous.

In determining whether the state courts decision was
objectively unreasonable, the court considers the withheld

31

evidence cumulatively in light of the record as a whole.  The government's case relied for the most part on the testimony of Davis and Mitchell.  There was no physical evidence, such as fingerprints or ballistics evidence, to link the defendants to the crime.  Crawford argues that the cumulative effect of the withheld evidence would have been to destroy the credibility of the government's witnesses and to permit him to argue that George Jefferson was the second shooter.

Except for the evidence concerning George Jefferson, Crawford contends that the significance of the undisclosed evidence is as impeachment material.  Impeachment of eyewitness testimony is an important factor in *Brady* analysis. In *Kyles*, the Supreme Court stated that "effective impeachment of one eyewitness can call for a new trial."  514 U.S. at 445.  The Supreme Court in *Kyles* did not, however, announce a rule that whenever an eyewitness could have been impeached with statements that had not been disclosed, there must be a new trial.  This is evident because in *Strickler v. Greene*, 527 U.S. 263 (1999), decided four years later, the Supreme Court held that even severe impeachment of the only eyewitness to the crime, who "provided the only disinterested, narrative account of what transpired" did not meet Brady materiality standards, in light of other evidence that implicated the defendant in the murder.  527 U.S. at 292-294.  Thus the

analysis of impeachment evidence involves a determination of both
how strong it is and what its impact is in light of all of the
other evidence, including other nondisclosed evidence.

Elijah Mitchell.

This court finds that the state court's conclusion that the
withheld evidence would not have impaired Mitchell's credibility
is not objectively unreasonable.  Mitchell's trial testimony
indicated that he knew the defendants before the shooting and
that there was bad blood between the defendants and him.  He
further testified that he never saw the defendants when they were
not together, and that they lived together around the block from
him in Gretna.  He said that he had earlier confrontations with
Crawford and Lindsey, the last of which occurred two days before
the shooting.  He testified that the defendants threatened him.
There was no evidence that Mitchell had a motive to set up
Crawford.  He testified that he identified the defendants after
he received one shot in his right temple that apparently went
through a baseball hat.  He said that after he received the first
shot he turned around and looked defendants in the face and saw
who they were before they continued to shoot him.  It was
daylight when the shooting occurred.  When he got out of the
hospital after the shooting, he identified both defendants in a

33

pretrial photographic lineup.  There was no evidence that the
photographic lineup was suggestive.  Crawford relies on the fact
that, before trial, Mitchell said that he knew George by only his
first name, whereas at trial he testified that he knew Crawford's
first and last names.  In the context of the entire record, the
court does not find that this statement alone or together with
other excluded evidence would have impaired Mitchell's
credibility in any but an inconsequential way.  Mitchell did not
try to suggest that he knew the defendants well or that he had a
longstanding relationship with them.  He said at trial that he
had known them only about a month or a month and a half.  He did
not discuss any dealings with them except to describe tersely
the earlier confrontations.  Further, that Mitchell said before
trial that Crawford had a small caliber gun was not inconsistent
with his trial testimony.  At trial he said that Crawford, unlike
Lindsey, had a small gun, but he did not specify the caliber.
The jury already knew that there was an inconsistency between
Davis's and Mitchell's description of the guns.  (*See* Trial Tr.
at 140).

     In sum, Mitchell gave eyewitness testimony not just that he
saw who shot him, but also that they were not strangers to him
and that they had previously threatened him in a verbal
altercation two days before.  His testimony also placed Crawford

34

in Lindsey's company on more than one occasion before the shooting, and he stated without contradiction that they lived together around the corner from him.  Furthermore, there was no evidence that Mitchell's identification of Crawford from the photo lineup was tainted.  His testimony would not have been significantly impeached by any of the withheld evidence.

Crawford argues that Mitchell's testimony that he had been shot once before he identified the defendants renders his testimony incredible.  The jury was aware of that testimony, and the overall effect of the undisclosed evidence does not make his identification less believable.  His statement as to the circumstances of the shooting is fully consistent with his pretrial statement.  The undisclosed evidence does not render his testimony suspect.

Shirley Davis.

The most serious potential threat to Davis's credibility is the undisclosed evidence that Davis requested that she be relocated before she gave a statement to the police.  Crawford argues that he could have used this information to suggest that Davis had a motive to fabricate her identification of the perpetrators in order to get a new apartment.  The state court found that Crawford's use of this evidence at trial would likely

35

have done him more harm than good because it would have enabled the state to elicit testimony from Davis that she had received a threat from the perpetrators of the crime shortly after the shooting.  This court does not find the state court's conclusion objectively unreasonable.

The record reflects that Davis talked about being threatened on three occasions before trial.  On September 23, l994, Detective Graffeo made the following entry in his supplemental report:

> Davis stated that she witnessed the murder of Sheri
> Bailes and was scared for her life because the
> perpetrators were threatening her. . . . Davis stated
> to Detective Graffeo that she would come forward and
> give a statement only if she could be relocated from
> the Fisher Housing Project.  Detective Graffeo
> informed Davis to come to Police Headquarters and he
> would put her through the proper channels for
> relocation.  Davis agreed.

(Foker Aff. Ex. B at 13).  In her pretrial statement, Davis said that as the defendants were leaving the scene they looked her in the face.  She said that she was yelling, "If my momma got [sic] here they ain't got to open my mouth, cause I gonna open my mouth for 'em, I say if my momma got [sic] here I gonna definitely tell the police."  (Foker Aff. Ex. H at 5).  Later in the interview she said that she was threatened, stating that "he sent a threat." When asked what the threat was, she said, "He was coming back to kill me."  *Id*. at 9.  At a pretrial suppression hearing

on the morning of trial, Davis repeated that she had been
threatened before she went to the police, and indicated that the
defendants did not personally deliver the threat to her.
(Petr.'s Ex. A, Vol. 4, Ex. D, Mot. Hr'g Tr. at 810-11).  After
the suppression hearing and before the beginning of trial, the
trial judge forbade the state from using evidence of the threat
unless Davis's credibility was under attack for not giving the
police a statement on the day of the murder.[16]  Crawford's use of
the relocation request to impeach Davis's credibility would have
come within that ruling.

   Crawford stresses that Davis did not say that he personally

_____

   [16]At the suppression hearing, the trial court granted
Lindsey's motion *in limine* to exclude any evidence of threats
made against any of the prosecution's witnesses.  *(See id*. at
820).  After opening arguments, however, the court modified its
ruling:

   I had previously ruled on the response to the Motions in
   Limine.  I would allow no questions from the State of
   Louisiana regarding threats made on the life or the safety
   of the witness, Ms. Davis, in an effort to prohibit the
   State from bringing out any evidence of the crimes or any
   threats the defendants had participated in.  However, I
   modified that rule and if there is a cross examination of
   this witness along the line that she's an incredible witness
   or her credibility is in question because of the fact she
   delayed the reporting of this, I will allow redirect from
   the State of Louisiana as to the reason why she delayed.
   Now, State, I understand that the reason she delayed was
   that she was afraid because she's explained that during the
   Motion hearing.

(Trial Tr. at 25-26).

threatened her.  He further points out that after Davis gave her
statement, the police offered her a temporary apartment in the
Melpomene housing project in New Orleans, and she turned it down.
(*See* Foker Aff. Ex. B at 14).  According to Detective Graffeo's
report, Davis said she did not want to live in the Melpomene
project and would stay in her own residence in the Fischer
project.  *Id.*  Crawford contends that this shows that she was not
afraid.  On balance, it could only have hurt Crawford's case to
have opened the door for Davis to explain to the jury that she
asked to be relocated after she received a death threat because
she saw the defendants commit the murder.  That she decided to
stay in the Fischer project, where at least she had family
members around her,[17] instead of moving to another New Orleans
housing project might or might not have cast some doubt on the
extent to which she was afraid.  But at the price of injecting a
death threat into the case, considering the impact that could
have on the jury, the impeachment value of the apartment evidence
overall is not substantial.  Furthermore, in the context of the
entire trial, the utility of this evidence would be further
reduced for another reason.  After Davis turned down housing in

---

[17]Davis' testimony indicated that her mother, sister,
cousins and possibly her aunt lived in the Fischer project.
(Trial Tr. *passim*).

the Melpomene housing project, she nevertheless continued to
assist the investigation.  First, she showed up to view the photo
array in which she identified Crawford two months later.  She
also appeared at the trial to testify against the defendants.
There was no evidence that there were any further discussions
between Davis and the police concerning housing after her initial
encounter with Detective Graffeo.  Nor is there any evidence that
she ever received anything from the police.

    Petitioner also argues that the apartment offer establishes
that Davis committed perjury at trial.  On direct examination,
Davis testified as follows:

> Q:   Now, did the detective show these
>      photographs, did they force you to pick
>      anybody out of here?
>
> A:   No.
>
> Q:   Did they threaten you to pick somebody
>      out?
>
> A:   No.
>
> Q:   *Did they promise you anything?*
>
> A:   *No.*

(Trial Tr. at 123) (emphasis added).  Petitioner argues that this
testimony was false because the police had, in fact, offered
Davis a new apartment.  The state court found that this testimony
was accurate because Davis turned down the apartment that was

39

offered to her and therefore "received nothing from the police." *Crawford*, 848 So. 2d at 629.  This Court also finds that Davis' testimony was not false, but for different reasons.

First of all, Detective Graffeo's Supplemental Report, which is the source of Crawford's argument, does not specifically state that he promised Davis an apartment to come in and give a statement.  When Davis said that she wanted to be relocated, Graffeo told her that he would "put her through proper channels for relocation." (Foker Aff. Ex. B at 13).  To have to go through the "proper channels" conveys something short of a promise.  Further, Graffeo did not offer to relocate Davis to the Melpomene Project until after she gave the statement. *Id*. Ex. B at 13-14.

Even if the Court assumes that Detective Graffeo's legalistic language led Davis to believe she had been assured of relocation, Crawford has not shown that Davis's testimony was perjurious.  Read in context, the series of questions the prosecutor asked Davis concerned whether Davis had been threatened, coerced, or promised anything to identify a particular person, *i.e.*, Larry Lindsey, from the photo array. There is nothing in the record to suggest that the police told Davis that they would relocate her only if she identified Lindsey from the photo array.  Accordingly, petitioner's argument that

40

the foregoing testimony shows that Davis perjured herself at trial is unfounded.

Petitioner also contends that evidence that Davis had given two other last names for Crawford as of the day after the murder would have undermined the credibility of her photo identification of Crawford two months later. Davis testified at trial that she did not know George's last name at the time of the shooting or when she first spoke to police, but that she had seen him around the neighborhood. She said that after her initial meeting with police, but before the police presented her with a photo array containing Crawford's picture, she learned Crawford's name by asking people in the project. (Trial Tr. at 121-22). When Davis initially called Detective Graffeo, he noted that she mentioned Ascort as George's last name. (Foker Aff. Ex. B at 13).[18] Two hours later, when she came in to give a statement, she said that she did not know Crawford or where he lived but that she had seen him around the project. *Id*. Ex. H at 7. She said that she did not know his name. *Id*. Later in the interview, she said she got the name George Caldwell from other people in the project. *Id*. at 9. The state court concluded that there was no real conflict

---

[18] Lester Mitchell, Elijah Mitchell's uncle, also mentioned the name George Ascort as the possible name of the second shooter. Detective Graffeo's report indicates that he ran the name through the "NCIC Computer" and it turned up negative. *Id*.

on this point between Davis's pretrial statements and her trial testimony because the jury was aware that Davis did not know the second shooter's name at the time of the shooting.  Crawford, 848 So. 2d at 628.

Davis' pretrial statement makes clear that she did not know George Crawford other than by sight, and, at that time, she had no personal knowledge that his last name was Caldwell or anything else.  Her trial testimony is not inconsistent with that. Furthermore, her testimony that she learned Crawford's actual last name after her statement by asking around the project is not inconsistent with her initially having relayed two names that she had heard and that turned out to be wrong.  Although the defense could have attacked Davis's credibility by showing that she passed along two other names in the first day after the shooting to suggest that Crawford's was the third name she came up with, it is doubtful that would have had much effect.  The jury knew that she did not know Crawford personally or his last name at the time she originally  spoke to the police.  The jury was also informed that the basis for her eventual knowledge of Crawford's last name was not firsthand knowledge but information that she obtained from people in the project. Further, the jury was never led to believe that Davis was the original source of Crawford's last name, and the jury knew that other last names for Crawford

42

had surfaced in the investigation.  Detective Graffeo testified

that he had received other last names for Crawford but no one was

sure what it was.  (Trial Trans. at 48).[19]  Under these

circumstances, it is not reasonably probable that the jury would

have disbelieved Davis's identification of Crawford from the

photo lineup.  Davis knew Crawford by sight before the shooting,

and that she passed on two different last names for him within 24

hours of the shooting does not undermine her identification.  She

was shown the photo lineup to determine whether she could

identify a face, not to give a name, and she admitted that her

source of information as to Crawford's last name was other

individuals in the project.

Several other of the statements that Crawford asserts could

have been used to impeach Davis's testimony reveal relatively

_____

[19]Petitioner also argues that Graffeo was impeachable by
evidence that Davis gave two other names for Crawford, in that he
testified that Davis didn't know the second shooter's last name.
Graffeo testified that Davis "knew him from the area but she
didn't have a last name on him.  I received numerous last names,
Jefferson, Ashcott, and different names but no one was positively
sure what it was."  (Trial Tr. at 48).  Graffeo's testimony did
not clearly indicate that Davis had provided him with two
different last names for the second shooter, so the undisclosed
evidence might therefore have had some impeachment value.  But
Graffeo's testimony clearly conveys that there was uncertainty
concerning the second shooter's last name, and the Court finds
that the undisclosed evidence would not have undermined Graffeo's
credibility, alone or in the context of all of the other
undisclosed evidence.

minor inconsistencies that likely would not have significantly impaired her credibility.  For example, the inconsistency between Davis's pretrial statement and her trial testimony concerning the clothing that the perpetrators wore was that she basically transposed the descriptions:  at trial, she testified that Lindsey wore a purple sweatshirt with a hood, and petitioner wore a dark, long-sleeve shirt.  But in her pretrial statement, Davis stated that Lindsey wore the dark, long-sleeve shirt, and the second shooter wore a purple and white hooded sweatshirt. Although this inconsistency is not wholly insubstantial, neither is it likely devastating to Davis's credibility, given that the two descriptions were generally similar, though transposed, and that well over two years had elapsed between the shooting and the trial.  Nor would Davis' credibility have been significantly affected by the notation in the 911 log stating that an unidentified caller reported that the shooters were "running" up the breezeway, contrary to Davis's testimony that they walked back through the breezeway.  First, although the statement from the 911 log differs from Davis's testimony with respect to the speed at which the shooters departed from the scene, it is supportive of Davis's version of the events generally (*i.e.*, that the shooters came and went via the breezeway).  In any event, a jury would not likely consider a minor discrepancy between

44

Davis's testimony and a statement by an unidentified 911 caller to weigh heavily on Davis's credibility.[20]  Moreover, Davis's pretrial statements about whether the perpetrators had guns in their hands as they got out of the car and whether she went over to the car at any point after the shooting do not irreconcilably conflict with her trial testimony, and their use at trial would therefore not necessarily have harmed her credibility.

Finally, the state court found that the fact that Davis told the police in her initial statement that "there was just a crowd of people outside" at the scene of the shooting, whereas at trial she revealed that her family members were at the scene would not have jeopardized her credibility.  The state court reasoned that it was evident "she was afraid and therefore would have been hesitant at first to identify other witnesses, especially her relatives, who were at the scene."  *Crawford*, 848 So. 2d 615.  This Court does not find the state court's conclusion objectively unreasonable.

---

[20]In addition, the description of the perpetrators' clothing in the 911 log (Foker Aff. Ex. C) is not material because it was cumulative of other evidence before the jury.  Davis's testimony concerning the perpetrators clothing at trial was generally consistent with the 911 log, and the jury already knew that Davis's description of the shooters' clothing conflicted with Mitchell's.

45

George Jefferson.

The final piece of undisclosed evidence is the anonymous call to police stating that the second shooter's name was possibly George Jefferson.  Detective Graffeo's supplemental police report recites that, the morning after the shooting, the police received a call concerning the incident:

> At about 11:15 am., Detective Graffeo was
> contacted by telephone by a black female who
> refused to identify herself.  This anonymous
> female informed Detective Graffeo that . . .
> there were two perpetrators who shot the
> victims.  One of the perpetrator's [sic]
> first name was George.  The possible last
> name was Jefferson, but the female was not
> sure.  The female went on to state that she
> thought "George" lived [in] or frequented the
> area of 2000 Lebouef [sic] Ct.  The female
> added that she did not know the second
> perpetrator.  Detective Graffeo ran the name
> of George Jefferson, and the 2000 block of
> Lebouff [sic] Ct. through MOTION Computer,
> but did not find any concrete information.

(Foker Aff. Ex. B, at 12).

Given the general state of uncertainty about the second shooter's last name immediately after the shooting, this call, without more, would not significantly help Crawford.  Indeed, Detective Graffeo testified at trial that he had received the last name "Jefferson" during the course of his investigation. (*See* Trial Tr. at 48).  Crawford argues, however, that when he received the supplemental police report after trial, his

46

investigation uncovered additional evidence about George
Jefferson that he could have used to show that the police
investigation was not thorough, or to point to George Jefferson
as one of the shooters.

Graffeo's Investigation.

Withheld evidence that would permit a defendant to
meaningfully challenge the adequacy of the police investigation
can play a significant role in a *Brady* materiality analysis.  In
*Kyles*, *supra*, the Supreme Court discussed at length the
potentially significant value to the defense of evidence that
would highlight the police investigators' apparent lack of
skepticism when dealing with a witness who had previously made a
number of inculpatory statements.  The Court noted that
disclosure of the witness's inculpatory statements would have
permitted the defense to "examine[] the police to good effect on
their knowledge of [the] statements and so have attacked the
reliability of the investigation in failing even to consider [the
witness's] possible guilt . . . ."  *Kyles*, 514 U.S. at 446; *see
also id.* at 446 n.15 (noting that "indications of conscientious
police work will enhance probative force and slovenly work will
diminish it").

Detective Graffeo's supplemental report stated that his

47

check of the motion computer on September 24, 1994 for the name George Jefferson and 2000 Le Boeuf Court produced no concrete information.  The withheld evidence does not the show the results of the September 24 motions computer search.  In his post-conviction investigation, Crawford obtained a computerized motion status report on George Jefferson dated October 19, 1995. (Foker Aff. Ex. E).  It is possible to reconstruct Jefferson's arrest information as of September 1994, because the motion status report contains a cumulative history of Jefferson's arrests.  *Id*. That report showed that as of September 1994, Jefferson had no convictions but that he had been arrested once, and for the first time, the year before on June 22, 1993 for an aggravated assault with a firearm.  The report does not show that George Jefferson lived at LeBoeuf Court at that time.  The only address shown with the June 1993 arrest is 1335 Wall Court, but it is unclear if that is the address where the arrest was made or where Jefferson lived.  Wall Court is in or near the Fischer project.  The report indicates that in 1993 and 1995, Jefferson had one gold tooth. Jefferson's date of birth was October 9, 1975, which would have made him almost 19 years old at the time of the Bailes murder. The report indicated that Jefferson was 6' 3" tall and weighed 190 pounds, but it is unclear whether that was as of 1993 or 1995.  To the extent that Crawford contends that the motion

48

report would have confirmed that Jefferson lived on or frequented LeBoeuf Court as the anonymous caller said might be the case, the report does not bear that out.  There is no indication that Detective Graffeo pursued the matter after running Jefferson's name and the LeBoeuf Court address in the motion computer or that there was other documentation that he knew about or had in the investigative file concerning George Jefferson.  In sum, Crawford's evidence suggests that Detective Graffeo found that there was in fact a George Jefferson who was almost 19 years old, that he had no convictions but a first time arrest that was over a year old for aggravated assault with a weapon in the Fischer Project, and that the address listed did not match the information of the anonymous caller.

Crawford contends that Graffeo's investigation was sloppy because his post-conviction investigation discovered other evidence available to the police concerning George Jefferson that indicated that the police should have viewed him as the prime suspect.  Specifically, Crawford obtained the incident report on Jefferson's June 1993 arrest, which showed his address to be 2025 LeBouef Court.  (Foker Aff. Ex. D).  He also obtained information that, nine months after the Bailes murder, Jefferson was arrested again for beating his girlfriend with a frying pan on July 11, 1995, and his address at that time was 1415 Wall Street.

49

(Petr.'s Ex. A, Vol. 4, Ex. E).  Further, Crawford discovered that Jefferson was killed on Thayer street in October 1995 in the area where the Bailes murder occurred a year earlier.  (Foker Aff. Ex. G).

The Court does not find it reasonably probable that the other Jefferson information would have undermined the credibility of the police investigation.  The name George Jefferson was an early tip, and the name never resurfaced in the investigation.  Over the next two months, the police obtained two eyewitness statements and two eyewitness photographic identifications of Crawford and Lindsey.  Lindsey was under arrest, and there was a warrant out on Crawford.  As of that time, the other available information on George Jefferson was that he lived at LeBouef Court in 1993, when he was arrested for the first time for firing an automatic weapon in a fight, and he was the same age and roughly the same physical size as some of the descriptions the police had obtained of the second shooter.  *See* discussion, *infra*.  It is doubtful that a jury would have believed that the police should have continued to investigate the Jefferson tip in light of the evidence the police had in hand.[21]

---

[21] To the extent that Crawford argues that Jefferson's arrest record pointed to Jefferson as the prime suspect, the Court notes that Crawford's arrest record, which Detective Graffeo checked, was more storied than Jefferson's.  *Compare* St.

<u>Other Suspect</u>.

Crawford's most serious argument is that the disclosure of anonymous tip would have allowed him to present an alternative theory of the crime and an alternative suspect.  In evaluating this argument, the Court has considered relevant case law on how courts weigh alternative suspect evidence under *Brady*.  The Court's review of the case law reveals that there is no per se rule under *Brady* requiring the government to disclose all evidence concerning alternative suspects.  *See Kiley v. United States*, 260 F. Supp. 2d 248, 273 (D. Mass. 2003).  When there is no plausible nexus between the alternative suspect and the crime, courts have not found the evidence material.  *Id.*  In *Kiley*, the court rejected a defendant's *Brady* claim that the prosecution failed to disclose a number of reports implicating other individuals besides the defendant as involved in the bank robbery at issue, including an informant who told police that two years before the robbery he worked with another person who expressed an interest in robbing the same bank vault.  In addition, citizens reported hearing from people claiming to be involved in the robbery or taking responsibility for the robbery.  *Id.* at 268-74.  After noting the strong evidence against the defendant, the court

---

R. Vol. 4, document marked Ex. 3, consisting of 18 pages, with Foker Aff. Ex. E; *see also* Foker Aff. Ex. B at 17.

held that the undisclosed reports identifying alternative
suspects did not establish a *Brady* violation because the reports
did not provide a "plausible nexus" linking the other suspect to
the crime.  *Id.* at 270, 273.  Similarly, in *Spence v. Johnson*, 80
F.3d 989 (5th Cir. 1996), the Fifth Circuit rejected a *Brady*
claim grounded on undisclosed evidence of an alternative suspect
when the prosecution could have offered evidence to exculpate the
alternative suspect.  80 F.3d at 998-99 ("In short, had Spence
been given these police records and presented his theory
regarding Harper at his trial, the State could have countered
with other facts exonerating Harper."); see also *Moore v.
Illinois*, 408 U.S. 786, 795 (1972) (no *Brady* violation when
undisclosed evidence concerned another suspect, an early lead
that police abandoned when eyewitnesses to the crime were found
and it was determined suspect was mistakenly identified); *Huber
v. Schriver*, 140 F. Supp. 2d 265 (E.D.N.Y. 2001) (no *Brady*
violation when undisclosed evidence of other suspect included
report classifying him as armed robbery suspect.)

     When there is evidence available to link the alternative
suspect to the crime, however, courts have found the
prosecution's failure to inform the defense about the alternative
suspect material.  In *Mendez v. Artuz*, 303 F.3d 411 (2d Cir.
2002), for example, the prosecution had evidence indicating that

another individual had put a contract out on the victim's life. 303 F.3d at 412-13.  In holding that the prosecution violated *Brady* by withholding this evidence from the defense, the Second Circuit emphasized that the evidence provided "a possible alternative perpetrator *and* motive" to kill the victim.  *Id.* at 413 (emphasis in original).  In *Sellers v. Estelle*, 651 F.2d 1074 (5th Cir. 1981), the Fifth Circuit found that undisclosed evidence was material when it provided an alternative suspect who could be placed at the scene of the crime and who allegedly admitted to others that he had committed the crime.  651 F.2d at 1075-77; *see also, e.g., Graves v. Dretke*, 442 F.3d 334, 343-44 (5th Cir. 2006) (state's failure to disclose co-defendant's statement implicating his wife in the crime violated *Brady* because it would have permitted defendant to argue that wife was the second participant in the crime); *Jamison v. Collins*, 291 F.3d 380, 390-91 (6th Cir. 2002) (evidence of alternative suspect material when undisclosed evidence showed that alternative suspect was found in possession of a wallet from a similar robbery and was known to wear a straw hat, which was consistent with description given by several witnesses); *Smith v. Sec. of NM Dept. of Corr.*, 50 F.3d 801, 810-12, 829-32 (10th Cir. 1995) (undisclosed evidence material when alternative suspect was seen in the area of the killings, found in possession of clothing that

appeared to have blood on it, had potential motive to kill one of the victims and had a prior conviction record); *Miller v. Angliker*, 848 F.2d 1312, 1322-23 (2d Cir. 1988) (undislosed evidence identifying alternative suspect, placing him in the area of the crimes on multiple occasions and noting physical evidence potentially linking him to murders, combined with fact that he was later arrested at location where murder victims were found, material under *Brady*); *Lopez v. Massachusetts*, 349 F. Supp. 2d 109, 116, 120-21 (D. Mass. 2004) (withheld evidence material when it identified alternative suspect with "method, opportunity and motive" to commit crime).

The anonymous call identifying George Jefferson as a potential suspect does not rise to the level of the type of alternative suspect evidence that courts have found material. Crawford has not established the kind of specific links between George Jefferson and the shooting that were present in the cases cited above.  The anonymous caller did not claim to have witnessed George Jefferson commit the murder; nor did she give any basis for the tip.  (Foker Aff. Ex. B at 12).  Further, there is no evidence in the record that Jefferson knew Sherri Bailes or Elijah Mitchell, the two victims, or Shirley Davis, the prosecution's other eyewitness.  Nor is there any evidence that Jefferson knew the defendants.  No evidence linked Jefferson to

54

the area on day of the shooting.  No physical evidence linked Jefferson to this crime.  There is no evidence that Jefferson had a motive to shoot these victims.  The police report on Jefferson's murder, which identifies his killer, suggests nothing that links either Jefferson or his killer to this case.  (Foker Aff. Ex. G).  Jefferson's aggravated assault arrest a year before this murder does not link him to this case, nor does the fact that he was arrested for beating his girlfriend with a frying pan almost a year after the Bailes murder.  Jefferson's two arrests were for heat of the moment assaults, not the same modus operandi as premeditated murder.

It is true that records of Jefferson's height are similar to the reports of the height of the second shooter.  Most of the records on Jefferson's height indicated that he was 6'3" tall, although his July 1995 incident report lists his height at 6'1". (*Compare* Foker Aff. Ex. E, G with Petitioner's Ex. A, Vol. 4, Ex. E).  The descriptions of the shooters in the record are consistent that one was slightly taller than the other.  Elijah Mitchell said in his pretrial statement that one shooter was 6'0" or 6'1" tall, and the other was around 6'3".  (Foker Aff. Ex. K). Mitchell's uncle, Lester Mitchell, reported that Lindsey was 6'2" tall and the other shooter was 6'4".  (Foker Aff. Ex. B). Shirley Davis likewise said in her pretrial statement that the

55

second shooter was a little taller than Lindsey, about 6'4".
(Foker Aff. Ex. H).  The arrest records of the defendants reflect
that Lindsey was 6'0" (Foker Aff. Ex. G) and Crawford was 6'1",[22]
which is consistent with the descriptions that the second shooter
was slightly taller than Lindsey.  Crawford also stresses that
the police reports show Jefferson's weight at 190 pounds and that
he had one gold tooth,[23] which, he argues, is close to Lester
Mitchell's report that the second shooter had a heavy build and
four gold teeth.[24]  But Crawford's arrest record reflects that he
weighed 195 pounds and had at least three gold teeth,[25] which is
significantly closer to Mitchell's description.  Overall, the
evidence as to Jefferson's physical characteristics would be of
more significance if Jefferson matched the description of the
second shooter, and Crawford did not.  Taken together the
evidence about George Jefferson does not provide a non-
speculative link between Jefferson and the Bailes murder.  This
Court does not find that the anonymous tip was material either

---

[22]Crawford's arrest records list him as 6' 1" and 195
pounds.  He was 19 years old at the time of the shooting.  His
arrest records show that he had three gold teeth.  (*See* State R.
Supp. Vol. 4, document marked Ex. 3, consisting of 18 pages).

[23]Foker Aff. Ex. E.

[24]Foker Aff. Ex. B.

[25]*See* Note 22.

alone or in combination with the other suppressed evidence.

   3.   *Cumulative Effect of the Undisclosed Evidence*

      Analyzed cumulatively, the undisclosed evidence does not
raise a reasonable probability that there would have been a
different result had the suppressed evidence been disclosed.  It
is true that the state relied primarily on the testimony of
Mitchell and Davis.  The undisclosed evidence would not have
impeached Mitchell's testimony in any consequential way.  His
testimony was coherent, established that although he did not know
the defendants for a long time, there was bad blood between him
and the  defendants, that they threatened him two days before the
murder, and that he saw them shoot him. He identified both
defendants in  photo arrays two weeks after the shooting.  There
is no evidence that the photo array was suggestive.  There is no
evidence that Mitchell had a motive to frame Crawford.  There was
no evidence that anyone else had a motive to shoot either
Mitchell or Bailes, including George Jefferson.  Mitchell put
Crawford in Lindsey's company on several occasions.  There was no
evidence that the two defendants did not in fact know each other.
On the other hand, there is no evidence that George Jefferson
knew either one of the defendants or was connected to the scene
of the crime on the day of the murder.  Crawford's suggestion

57

that the undisclosed evidence would have permitted him to argue that Jefferson threatened Mitchell to implicate him simply has no basis in the evidence.[26]

There is also not a reasonable probability that the totality of the undisclosed evidence would have changed the jury's evaluation of Davis's testimony. Davis was an unsophisticated, inarticulate witness. It was apparent from her testimony that once she recognized the assailants at the scene, events happened quickly. She was in motion, they were in motion, her mother was screaming, and shots were being fired. Her account of these events at trial was not always easy to follow, and she was not totally consistent as to the precise moment when one event happened in relation to another. Nevertheless, when her testimony is viewed as a whole together with all of the suppressed evidence, Davis does not come across, as Crawford suggests, as someone who fabricated being at the scene of the murder. She identified both defendants as the murderers, both of whom she knew at least by sight before the day of the murder. She had known Lindsey since 1990, and he had a child by her

---

[26]Crawford argues that Jefferson at one time had an address in Gretna, Louisiana, which is where Elijah Mitchell lived. However, the record Crawford relies on shows that Jefferson did not have a Gretna address until sometime after July 11, 1995, ten months after the Bailes murder. (*See* Foker Aff. Ex. E).

sister.  She did not know Crawford before the murder but had seen
him around the project.  She said that she recognized both
defendants when they arrived on the scene, saw them with guns,
saw them go through the breezeway, and saw them shooting.  She
saw where the shots were aimed, which was into the black
Corvette.  She saw defendants leave the scene.

     The most potentially significant piece of suppressed
evidence that could have affected Davis's credibility was her
request to be relocated before she talked to police.  As the
Court discussed earlier, however, had the defense used that
evidence it would more than likely have backfired because it
would have opened the door to Davis's account of receiving a
death threat.  That Davis turned down an apartment in the
Melpomene Housing project is not a strong basis to suggest that
she was fabricating the death threat or her identification of the
defendants, one of whom was the father of her sister's child.
She continued to insist that she had been threatened as of the
time of the trial, when she said so under oath at the suppression
hearing.  This was well after the apartment issue was off the
table.  Further, Davis's mother, sister, cousins and possibly her
aunt all lived in the Fisher project, and Davis may have
perceived staying with her family in the Fisher project as safer
than moving temporarily to another New Orleans housing project.

Moreover, if Davis's only motivation in identifying defendants was to get another apartment, it is doubtful that she would have continued to assist the investigation after she turned down the offer of housing.  There is no evidence she ever received anything from the police.  Nevertheless, after Davis turned down the apartment offer, Davis identified Crawford in the photo array and testified at the trial.

That Davis had given Detective Graffeo two other last names before she said she found out what Crawford's last name was from neighbors in the project would not have affected the credibility of her identification for the reasons the Court discussed earlier.  It would be different if Davis had said that she saw two other people commit the murder before she said that she saw Lindsey and Crawford do it.  That would have clearly cast doubt on the credibility of her identification.  But whether or not Davis knew Crawford's last name does not undermine her ability to identify the face of someone she recognized by sight.  She made it clear that her only source of information on Crawford's last name was other individuals in the project.  The rest of the inconsistencies Crawford points to between Davis's pretrial statement and her trial testimony singly are not substantial, and taken together are not materially more so.  Overall, the undisclosed evidence would not have materially changed her value

60

to the case.

Nor is it reasonably probable that disclosure of the anonymous tip would have altered the outcome of the trial. This is true because there were two eyewitness identifications, evidence of the existence of an animus between defendants and Mitchell, the eyewitnesses were not looking at total strangers when they saw the defendants at the scene, they were both able to identify the defendants before trial, and there is no nonspeculative connection between Jefferson and this murder, as the Court discussed in detail earlier.

Crawford also argues that Detective Graffeo's testimony that he learned the name Crawford in the course of the investigation was "another instance of misleading the jury." (Petr.'s Objections at 36). It was no secret to the defendants that Detective Graffeo obtained Crawford's name from Larry Lindsey, as this information was disclosed well before trial. On January 17, 1996, the state informed the trial court that it did not intend to use Lindsey's statement inculpating Crawford at trial, and it moved to join the defendants for trial. (Tr. Jan. 17, 1996 Mot. Hr'g, State R., Vol. 3 of 5). It was not misleading for Detective Graffeo to tell the jury that he obtained Crawford's last name during the course of the investigation when he learned it from Lindsey. Further, Detective Graffeo could not have

revealed to the jury that he obtained Crawford's name from
Lindsey, because the state assured the court that it would not
use the statement in the trial.  Crawford goes on to argue that
the undisclosed evidence would have permitted him to show the
jury that Lindsey implicated him because he was innocent.  On the
record as a whole, this Court does not find it reasonably
probable that Crawford would have helped himself by informing the
jury that his codefendant had implicated him in the murder.  This
follows because, even with the addition of the undisclosed
evidence, the state still had credible evidence identifying
Crawford, which Lindsey's inculpatory statement would tend to
reinforce.   This is especially true since no one contradicted
Mitchell's testimony that before he was shot, he never saw
Lindsey when Crawford was not with him and that he had
confrontations with both of them.

     Crawford argues that his case fits the mold of *Kyles v.
Whitley*, *supra*.  An examination of *Kyles* reveals that this case
is materially distinguishable from *Kyles*, both in the nature of
the suppressed evidence and its relative impact on the
prosecution and defense cases.  Central to the *Kyles* case was
that the police relied on an informant whose statements it
suppressed.  The informant's statements were replete with
significant inconsistencies, and affirmatively self-incriminating

assertions, and they indicated that the informant was anxious to see Kyles arrested for murder.  In addition to the suppressed evidence of the informant's statements, the government suppressed statements of eye witnesses that it relied on at trial who had changed stories or had given a pretrial description of Kyles that better described the informant.  Kyles's theory of the case was that he was framed by the informant who had planted evidence on him to shift the blame to himself.  Kyles took the stand, offered an alibi and called supporting witnesses.  The Court concluded that the net effect of the suppressed evidence favoring Kyles raised a reasonable probability that disclosure would have produced a different result.

Here, there is no undisclosed evidence from an informant who gave statements that implicated himself, were inconsistent and demonstrated a desire to see Crawford arrested for murder.  None of the suppressed evidence here alone or together is of the significance of the informant's suppressed statements in *Kyles*.  Further, unlike here, the eyewitnesses in *Kyles* did not identify a person whom they already knew, and one of them was not a victim himself who established that defendants had a motive to shoot him.  Moreover, in comparison to this case, the defense case in *Kyles* was stronger before the suppressed evidence was considered and made even stronger thereafter.  In this case, the defense

63

called no fact witnesses, neither defendant testified, and there was no alibi evidence.  The only testimony the defense offered was one expert.  This case falls short of the facts involved in *Kyles*.

For all of the foregoing reasons, the Court finds that Crawford has not shown that there is a reasonable probability that had the nondisclosed evidence been disclosed, there would have been a different result in his trial.  The state court's conclusion that the suppressed evidence was not material was therefore not an objectively unreasonable application of clearly established federal law.

## C.   Ineffective Assistance of Counsel

Crawford also argues that he received ineffective assistance from his trial counsel.  To demonstrate ineffective assistance of counsel, Crawford must satisfy the two-prong test set out in *Strickland v. Washington*, 466 U.S. 668 (1984).  First, Crawford must demonstrate that his trial counsel's performance was deficient.  *Id*. at 687.  To establish deficient performance, Crawford must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id*. at 689.  To sustain such a claim "requires showing that counsel made errors so serious that counsel was not

64

functioning as the 'counsel' guaranteed by the Sixth Amendment."
*Id.* at 687.  "Judicial scrutiny of counsel's performance must be
highly deferential" and must eliminate "the distorting effect of
hindsight." *Id.* at 689.  Second, Crawford must also establish
that counsel's deficient performance prejudiced the defense.  *Id.*
at 687.  To establish prejudice, a petitioner must prove that
there is a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would have
been different.  *Id.* at 694.  If the Court finds that a
petitioner has not met the requisite showing as to either prong,
the Court may dismiss the claim without addressing the second
prong.  *Id.* at 697.  A claim of ineffective assistance of counsel
is a mixed question of law and fact.  *Moore v. Cockrell*, 313 F.3d
880, 881 (5th Cir. 2002).

Crawford argues that the state court's application of
federal law was objectively unreasonable.  He objects to the
magistrate's report and recommendation on three grounds: (1)
counsel failed to obtain a copy of Mitchell's driver's license,
which indicates that Mitchell was not allowed to drive without
corrective lenses and a special outside mirror;[27] (2) counsel

---

[27]Crawford submits a copy of Mitchell's driver's license
that indicates that Mitchell is under restrictions "3, 4, 00,"
but Crawford submits no evidence as to what those restrictions
are.  (Vol. 9, Aff. of Eric Foker, Ex. J).

failed to obtain a crime scene expert who would have rebutted
Davis's testimony that the shooters began shooting at the end of
the breezeway, because no casings were found there, casting
additional doubt on her credibility; (3) counsel failed
adequately to cross-examine Davis about how close the shooters
got to the car, which would have revealed inconsistencies between
her testimony and both Mitchell's testimony and the physical
evidence.

The Court cannot conclude that the state court unreasonably
applied federal law.  The state court rejected Crawford's first
argument, concluding that "[t]here is no indication . . . that
there was any evidence to make counsel believe that Mr. Mitchell
had any visual disability. . . .  Nor is there any indication of
whether or not Mr. Mitchell was wearing corrective lenses at the
time of the shooting." *Crawford*, 848 So. 2d at 632.  Crawford
argues that counsel should have been alerted that Mitchell's
eyesight was deficient by the presence of a pair of eyeglasses
folded on the floor of the Corvette in front of the passenger
seat in which Mitchell was sitting.  To support this assertion,
Crawford relies on a crime scene photograph that does not show
the floor of the Corvette in front of the passenger seat. (*See*
Petr's. Ex. A, Foker Aff., Ex. M).  Even accepting that counsel
should have been alerted to Mitchell's deficient eyesight,

66

however, the failure to obtain Mitchell's driver's license and question him about his eyesight at trial is not so serious an error as to fall outside the wide range of reasonable assistance. Counsel is not obligated to investigate every conceivable nonfrivolous matter. *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992). Further, Crawford has not addressed the state court's second point that there is no evidence that Mitchell was not wearing corrective lenses at the time of the shooting. Without such evidence, Crawford cannot show that he was prejudiced by counsel's failure to question Mitchell about his eyesight.

The state court also rejected Crawford's second argument that his counsel was ineffective because he failed to hire a crime scene expert who, Crawford asserts, could have testified that the placement of the shell casings indicates that the shooters must have been near the Corvette and not, as Davis testified, just off the breezeway more than 50 feet away from the Corvette. The state court concluded that counsel's performance was not deficient for this reason because there is no indication that counsel knew before trial how Davis would describe the shooting, so there was no reason for him to anticipate that a crime scene expert would be valuable. Crawford does not address the state court's analysis. Although Davis did testify at a

67

pretrial motions hearing and gave her account of the shooting,
that hearing took place the same day as the one-day trial, which
did not leave counsel time to obtain a crime scene expert once he
knew how Davis would testify.  The Court finds that the state
court's decision was not an objectively unreasonable application
of federal law.

The state court also rejected Crawford's third argument,
that counsel was ineffective because he failed to cross-examine
Davis on the basis of her pretrial testimony at the motions
hearing.  At the hearing, Davis testified that the shooters
"didn't get close to the car" (Mot. Hr'g Tr. at 31), while
Mitchell testified at trial that the shooters were firing at him
at relatively closer range.  (Trial Tr. at 78).  Crawford argues
that cross-examination would have revealed the contradiction
between Davis's testimony and both Mitchell's testimony and the
physical evidence that casings were found only on the street near
the car.  The Court finds that counsel's performance was not
deficient.  Crawford is relying on the thorough review permitted
by a written record of the proceedings to point out intricate
details revealed by a close examination of that record.  Such an
examination is not consistent with the judicial deference to
counsel's performance that *Strickland* requires, much less with
*Strickland*'s requirement that "every effort be made to eliminate

the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  466 U.S. at 689.  Accordingly, the Court finds that Crawford has failed to establish that he received constitutionally inadequate assistance of counsel.


## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Crawford's petition for a writ of habeas corpus.

New Orleans, Louisiana, this 11th day of July, 2006.


_Sarah Vance_
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE